**STATE of Tennessee, Appellee,**

v.

**Bobby M. ANDERSON, Appellant.**

Court of Criminal Appeals of Tennessee, at Nashville.

Jan. 20, 1994.

Permission to Appeal Denied by Supreme Court June 13, 1994.

Martin G. Szeigis, Nashville, for appellant.

Charles W. Burson, Atty. Gen. and Reporter, Merrilyn Feirman, Asst. Atty. Gen., Victor S. Johnson, III, Dist. Atty. Gen. and Nick Bailey, Asst. Dist. Atty. Gen., Nashville, for State.

WADE, Judge.

### OPINION

The defendant, Bobby M. Anderson, was convicted on six counts of aggravated rape. The trial court imposed sentences of 16–½ years on each count. Counts 1, 2 and 3 are concurrent with each other; Counts 4, 5 and 6 are also concurrent with each other, but consecutive to the sentences imposed in Counts 1, 2 and 3. The effective sentence is, therefore, 33 years.

The defendant presents three issues for appellate review:

(1) whether the trial court erred in denying the defendant's motion for judgments of acquittal on each count;

(2) whether the trial court erred in imposing consecutive sentences; and

(3) whether the trial court erred by allowing a licensed clinical social worker to qualify as an expert witness and give testimony about characteristics, specifically recantation, believed to be typical among child victims of sexual abuse.

We find that the trial court erroneously admitted testimony by the social worker. Accordingly, the convictions are reversed. Because we are unable to classify the error as harmless, we remand for a new trial on each count.

The victim, eight years old at the time of the trial, is a first cousin to the defendant. The defendant, age twenty-four, had resided with the victim and his parents for a year or more at two separate residences when the crimes allegedly occurred.

The convictions are based almost entirely upon the testimony of the victim. He related that he would occasionally stay with the defendant alone while his parents were at work. They slept in adjacent bedrooms. When asked whether the defendant ever did anything that he did not like, the victim answered that the defendant "touched my private" with both his hand and his mouth. In his own language, the victim testified to in-

stances where each had performed both oral and anal sex on the other. The events first occurred when the victim was 6 years old and lived at 1253 Old Hickory Boulevard in Nashville.

The victim testified that the first sexual contact occurred in his bedroom while his mother and father were asleep in a room next door. When asked about how many times it occurred, the victim testified, "A lot." Although initially uncertain whether further sexual contact occurred after the first instance, the victim later recalled that after he and his parents had moved to 649 West Old Hickory Boulevard (where they lived at the time of trial), there were other occurrences of both oral and anal sex—each performed by the other. The victim admitted that he had never asked the defendant to stop. He testified that the defendant warned the victim that if he told either his mother or his father, that he would get a whipping.

The victim related that he first mentioned the incidents to his 12–year–old female cousin, H.H. In turn, H.H. told her mother, Deborah Halliburton. When confronted by Ms. Halliburton and H.H., the victim first denied that he had made such a statement. Later, he admitted to his aunt that he had told his cousin of the events but then denied that what he had alleged was true. After this denial, the victim admitted to both the defendant and Ricky Halliburton, that his allegations were untrue.

During his testimony, the victim acknowledged that he had at first told his mother that he had lied about the incident. He stated that he went to his room for a time, returned, and then told his mother that his original allegations against the defendant were true.

On cross-examination, the victim admitted having told both H.H. and her brother, Ricky Halliburton, that he had made up the whole story and was "only joking." On redirect, the victim acknowledged that he and H.H. had done some "bad things" as well. He related that he would "get on top" of his 12–year–old female cousin; he claimed to have learned that behavior from instances of sexual misconduct by the defendant. On recross, however, the victim stated that he had done

those things with his cousin before the defendant came to live with them. The victim agreed that the defendant was always nice, never hurt him, and would often buy him things. Although the victim admitted that he liked the defendant when they lived together, he stated that he no longer cared for the defendant and was not sad when the defendant moved away to live with his girlfriend.

By our count, the record demonstrates that the victim, by his own testimony, recanted his initial allegations against the defendant on four separate occasions to five different people.

Janet Lee Norris is the mother of the victim and an aunt of the defendant. At trial, she testified that the defendant came to live with her family in May of 1989 and continued living with them until July 17, 1990. She described the relationship between her son and the defendant as close. One day after work, the defendant told her to call her sister, Ms. Halliburton. It was during this telephone conversation that Ms. Norris said she first learned of the allegations against the defendant. When directly questioned, the victim at first denied that the charges were true; about 10 minutes later, however, the victim tearfully admitted to her the truth of his assertions. The victim explained to his mother that he had initially denied the occurrences only because of his concern that he might be punished by his parents and his more general fear of getting in trouble. Ms. Norris testified that her son acknowledged that he had told others he had lied about the incidents. She notified the Rape and Sexual Abuse Center immediately. Two days later, the victim was examined at General Hospital.

Ms. Norris admitted that she had never seen the defendant do or say anything improper to the victim. The victim exhibited no fear of the defendant in her presence and had never complained about his conduct. She acknowledged that she and her husband had a pornographic video in her residence but asserted that they did not watch it when the victim was in the house. Ms. Norris was unaware that the defendant had ever been in her son's room after she had gone to bed but

explained that she and her husband always left the radio on during their sleep.

Ms. Halliburton also testified for the state. She generally corroborated the sequence of events. Her 12–year–old daughter, H.H., had informed her of the victim's allegations against the defendant. When confronted, the victim denied that he told her daughter such a story; afterward, the victim cried, apologized, and stated that he had fabricated the story. She described the victim's response as "like he had gotten caught in another lie, to be honest about it." Ms. Halliburton testified that it was not unusual for the victim to make up things. Ms. Halliburton also testified to a bitter relationship that existed between Ms. Norris and Bobby Anderson, Sr., the defendant's father.

Ricky Halliburton, stationed in Germany with the United States Air Force at the time of trial, was subpoenaed to trial by the defendant but used as a state's witness. In a conversation that allegedly took place on July 5, 1990, he recalled the victim saying that he had made up the allegations against the defendant in an effort to be "funny." Halliburton testified that about two weeks later the victim repeated his claim that he had done nothing improper with the defendant. Halliburton also remembered that he had watched a pornographic video at the Norris residence sometime before the allegations were made known. When the victim walked in, Halliburton turned off the video.

Leane McGinnis, a family nurse practitioner, testified that she was on the child abuse evaluation team at the time of the complaint by the victim. The victim claimed to her that he had been sexually abused by the defendant. She examined the victim on July 19, 1990. She described the results as negative. Nonetheless, she stated that her findings did not necessarily preclude the possibility of anal penetration. She examined the victim with a Colposcope, which magnifies about ten to fifteen times, in order to determine the presence of cuts, scratches, or abrasions. Although Ms. McGinnis could neither confirm nor deny sexual abuse, she found no objection, medical evidence to support any such behavior.

Shelly Swift Johnston, formerly employed as a Child Protective Service Worker II with the Tennessee Department of Human Services, was with the Department's Sexual Abuse Unit at the time the allegations were made. Both Ms. Johnston and Virginia Blanton, a criminal investigator with the district attorney's office, participated in the investigation. Each interviewed the victim and his mother. Ms. Blanton also interviewed Ms. Halliburton.

H.H. testified for the defense. She stated that on the day the allegations were made, the victim was watching "naked people" on television before she told him to turn it off because she thought the defendant would object. At that point, the victim said, "No, me and [the defendant] do that." H.H. stated that she did not believe the victim's allegations but told her mother anyway. When confronted by Ms. Halliburton, the victim first claimed that H.H. had lied to her mother. Later, H.H. asked the victim to swear on a cross to the truthfulness of his allegations. At first he did so; subsequently, however, he admitted to her that he had lied when he made the charges. H.H. also testified that she and the victim had "touched" each other some four years earlier. She said the victim began to "touch" her again during the time the defendant resided with the victim and his family.

Edith Felts, the defendant's fiancee, testified that she and the defendant had dated for almost three years. During that time, she had never seen anything improper occur between the defendant and the victim.

The defendant, a high school graduate, worked for a construction company. He testified that he loved his cousin, the victim, "like a baby brother." The defendant stated that he first learned of the allegations on July 7, 1990, when the victim told him, "I lied; I said that you made me pull my pants down." The defendant claimed that he was the first to suggest that his aunt, the victim's mother, be told of the allegations and voluntarily turned himself in when he learned that formal charges had been made.

The defendant denied that he had engaged in sexual misconduct with the victim. The defendant implied that the allegations were

motivated by Ms. Norris' ill will towards his father who had several years earlier left his mother, who had since died. The defendant specifically denied either oral or anal sex with the victim. He stated that he had never touched the victim improperly, had never discussed sexual-related activity with the victim or shown the victim pornographic magazines, and had never touched the victim's genital area.

Juanita Moss, the mother of one of the victim's cousins, also testified for the defense. She stated that she had never observed the defendant, who resided with her and her family for a time, do anything improper with her 12–year–old daughter. When asked to describe the conduct of the defendant around children, she said, "He's nice to them. My kids love him to death."

On rebuttal by the state, Bonnie Beneke, a community coordinator and consultant with the Rape and Sexual Abuse Center in Nashville, testified extensively about her education, training, and experience for the University of Tennessee in the field of child sexual abuse. She stated that she had specific training on the "phenomenon" known as recantation and had trained others in this field of expertise. She had testified previously in courts throughout the country as an expert. In a jury-out hearing, defense counsel objected to Ms. Beneke being allowed to testify. The trial court ruled that the witness could testify but proposed limiting instructions to the jury. Pertinent portions of her testimony are as follows:

Q. (By Mr. Bailey:) Ms. Beneke, can you, first of all, just tell the jury what this idea of recantation is? What does it mean?

A. Well, when we talk about recantation we talk about disclosure. And when children disclose, our understanding of that is that what we at one point had thought was somewhat of an event is now our understanding it is more of a process, and that children are going to disclose in a variety of ways, and that they will either [disclose] accidentally or purposefully. But the majority of children disclose accidentally, in that they don't plan, they don't decide that today I'm going to tell somebody. So, we have the two kinds of disclosures.

And then the process is that what a child will do is that *they may initially deny that anything has happened to them,* that in the process of going through the sexualized behavior they learn—what they will do is accept that this is happening to them. And then at the point that they go and they tell someone that they may not get the kind of response that they may have hoped, or they thought the adults in the world would give them. And the offender who is molesting them may have told them, indeed, if you tell, no one will believe you, or if you tell, bad things will happen. And at the point of disclosure, when, indeed, this often happens then children will take it back. And *this is that point of recanting and saying it didn't really happen, because all those things they were told, here they are happening to them, so they take that back.*

And what we find is that many children will go through this process because—and until they can be convinced that indeed they did the right thing by telling, and that the things that they were told are not going to happen, and then they may move to reaffirming that the things they initially said truly happened. So it's a process of denying, and then taking it back, that it didn't happen, and then moving to, well, it really did happen.

So it's what we—*we now describe it as a predictable phenomenon,* and that if we—we've even sort of looked at how we approach these cases, an investigative protocol, how we approach them; that when we used to do it, and if a child would do this, then we would walk away and leave that child. And what we find is we've been leaving children in risky situations because this is a phenomenon that indeed happens often; and that if we leave them, then we leave them in risky situations. So that we now see it more as a process, and that we don't just stop there, that we may do more than the one interview, or we may stay with the child and try; here we had detailed information, initially, they took it back, and then later on they may go back to that.

Q. Okay. *So, after the disclosure you sometimes will have a recantation.*

A. *Yes.*

Q. All right. Are there cases in which a child discloses and then recants because it's not true.

A. Yes, absolutely.

Q. All right. *In those cases would you expect to find the third step, which is the reaffirmation?*

A. *Right—no, you would not.*

Q. Okay. Why is that?

A. Well, I think—well, because it didn't happen, and so that information—then, the child for whatever reasons will decide— whatever reasons it was that they made the allegations up initially, have decided they don't want to pursue that, and they didn't happen.

Q. So sometimes children recant because it really didn't happen?

A. Yes.

. . . . .

Q. *Is recantation something that you would describe as common* or uncommon in cases where children had been sexually abused?

A. *I would say it was something that was very common. It happens often.*

Q. And is it something that would be predictable or not predictable in a family setting?

A. The way that we train it and we discuss it is that *it is a predictable phenomena.* And that's fairly well documented in the research and the literature.

. . . . .

Q. This opinion that you've just given the jury, is that based on your training and educational background?

A. Both, my training and education.

Q. And is it based on your experience in this field—

A. Yes.

Q. —in dealing with hundreds of cases personally and then participating in thousands of others.

A. Yes.

(Emphasis added.)

After the direct testimony of Ms. Beneke, the trial judge gave an instruction in an attempt to place the evidence in proper perspective:

All right. Members of the jury, you have heard evidence from a witness on the subject of recantation of allegations of sex abuse by a child. This evidence is admitted to inform the jury of this phenomenon. It is not admissible to determine if this particular charge of sex abuse is true. The evidence is admissible solely for the purpose of showing that a child's reactions, as demonstrated by the evidence, are not inconsistent with having been the victim of child sex abuse. On the other hand, a child can also recant allegations of child sex abuse simply because the allegations are not true. The reason for the recantation in this case is for you [to] determine, along with whether you believe the testimony of the child, consistent with the other instructions which you will receive later from the judge. All right. Thank you.

Following the instruction of the trial judge, on cross-examination Ms. Beneke testified as follows:

Q. And your testimony is that recantation is a predictable phenomena but it's not a predictable indicator by any means.

A. No.

Q. So the mere fact that a child recanted doesn't indicate anything, really.

A. No, certainly not.

. . . . .

Q. Just because a child has recanted his story doesn't mean in any way that a child has been abused.

A. No.

Ms. Beneke was then questioned on redirect examination, and testified as follows:

Q. And the reverse question, Ms. Beneke. *Just because a child recants does that mean the child was not sexually abused?*

A. (Witness responds in the negative.)

Q. And these children that Mr. Szeigis asked you about who sometimes recant because it didn't happen, *are those chil-*

*dren likely to go on after that recantation and then reaffirm their initial position?*

A. *No, absolutely not.*

(Emphasis added.)

## I

The defendant's initial argument is that the trial court erred by denying his motion for judgment of acquittal at the conclusion of the state's proof. We disagree.

Rule 29(a) of the Rules of Criminal Procedure provides the basis for the motion for a judgment of acquittal:

> The court on motion of a defendant or of its own motion shall order the entry of judgment of acquittal of one or more offenses charged in the indictment or information after the evidence on either side is closed if the evidence is insufficient to sustain a conviction of such offense or offenses.

■ This rule empowers the trial judge to direct a judgment of acquittal when the evidence is insufficient to warrant a conviction either at the time the state rests or at the conclusion of all the evidence. At the point the motion is made, the trial court must favor the state with the strongest legitimate view of the evidence, including all reasonable inferences, and discard any countervailing evidence. *Hill v. State,* 4 Tenn.Crim.App. 325, 470 S.W.2d 853 (1971). *See Overturf v. State,* 571 S.W.2d 837 (Tenn.1978).

■ When a motion for acquittal is made at the conclusion of the state's evidence, the defendant must stand on the motion and present no further proof. Otherwise, any error is waived for purposes of appeal. If the defendant decides to present evidence, as he did here, he must renew his Rule 29 motion at the conclusion of the trial in order to preserve the issue for review. *Mathis v. State,* 590 S.W.2d 449 (Tenn.1979).

■ The standard by which the trial court determines a motion for judgment of acquittal at the end of all the proof is, in essence, the same standard which applies when determining the sufficiency of the evidence after a conviction. A jury verdict, approved by the trial judge, accredits the testimony of the witnesses for the state and resolves all conflicts in favor of the state's theory. *State v. Hatchett,* 560 S.W.2d 627, 630 (Tenn.1978). On appeal, the state is entitled to the strongest legitimate view of the evidence and any reasonable inferences which might be drawn therefrom. *State v. Cabbage,* 571 S.W.2d 832, 836 (Tenn.1978).

■ The credibility of the witnesses, the weight to be given their testimony, and the reconciliation of conflicts in the evidence are matters entrusted exclusively to the jury as the triers of fact. *Byrge v. State,* 575 S.W.2d 292, 295 (Tenn.Crim.App.1978). This court may neither reevaluate the evidence nor substitute its inferences for those drawn by the jury. *Farmer v. State,* 574 S.W.2d 49, 51 (Tenn.Crim.App.1978). A conviction may be set aside only when the reviewing court finds that the "evidence is insufficient to support the finding by the trier of fact of guilt beyond a reasonable doubt." Tenn.R.App.P. 13(e).

■ In this instance, the trial court overruled the defense motion for acquittal made at the conclusion of the state's evidence; the victim's testimony, taken alone and despite the obvious inconsistencies, was also sufficient in our view. Moreover, at the conclusion of the trial, the evidence was also sufficient to meet the applicable standards. The victim recalled instances of both oral and anal sex, each performed by the other, at both of the two residences in which the victim and defendant resided during 1989 and 1990. Despite the age of the victim and several instances of recantation, that testimony standing alone would be sufficient to withstand appellate review. In short, we have found enough evidence to support at least six separate instances of aggravated rape.

## II

Next the defendant contends that the trial court erred by the imposition of excessive, consecutive sentences. In response, the state asserts the propriety of consecutive sentencing. Although we have determined that there was error in the trial which precludes our affirmance of these convictions, we would have agreed with the state that

there was no error in the imposition of sentence.

■ When there is a challenge to the length, range, or manner of service of a sentence, it is the duty of this court to conduct a *de novo* review with a presumption that the determinations made by the trial court are correct. Tenn.Code Ann. § 40–35–401(d). This presumption is "conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances." *State v. Ashby*, 823 S.W.2d 166, 169 (Tenn.1991). The Sentencing Commission Comments provide that the burden is on the defendant to show the impropriety of the sentence.

■ Our review requires an analysis of (1) the evidence, if any, received at the trial and sentencing hearing; (2) the presentence report; (3) the principles of sentencing and the arguments of counsel relative to sentencing alternatives; (4) the nature and characteristics of the offense; (5) any mitigating or enhancing factors; (6) any statements made by the defendant in his own behalf; and (7) the defendant's potential for rehabilitation or treatment. Tenn.Code Ann. §§ 40–35–102, –103, and –210; *State v. Smith*, 735 S.W.2d 859, 863 (Tenn.Crim.App.1987).

Prior to the enactment of the Criminal Sentencing Reform Act of 1989, classifications qualifying one for consecutive sentences were first set out in *Gray v. State*, 538 S.W.2d 391, 393 (Tenn.1976). In that case, our supreme court held that aggravating circumstances must be present before placement in any one of the classifications. In *State v. Taylor*, 739 S.W.2d 227 (Tenn.1987), the court established an additional category for those defendants convicted of two or more statutory offenses involving sexual abuse of minors. The 1989 act is, in essence, the codification of the holdings in *Gray* and *Taylor*. Consecutive sentencing may be imposed in the discretion of the trial court upon a determination that one or more of the following criteria[1] exist:

(1) The defendant is a professional criminal who has knowingly devoted himself to criminal acts as a major source of livelihood;

(2) The defendant is an offender whose record of criminal activity is extensive;

(3) The defendant is a dangerous mentally abnormal person so declared by a competent psychiatrist who concludes as a result of an investigation prior to sentencing that the defendant's criminal conduct has been characterized by a pattern of repetitive or compulsive behavior with heedless indifference to consequences;

(4) The defendant is a dangerous offender whose behavior indicates little or no regard for human life, and no hesitation about committing a crime in which the risk to human life is high;

(5) The defendant is convicted of two (2) or more statutory offenses involving sexual abuse of a minor with consideration of the aggravating circumstances arising from the relationship between the defendant and victim or victims, the time span of defendant's undetected sexual activity, the nature and scope of the sexual acts and the extent of the residual, physical and mental damage to the victim or victims;

(6) The defendant is sentenced for an offense committed while on probation; or

(7) The defendant is sentenced for criminal contempt.

Tenn.Code Ann. § 40–35–115(b).

■ In our view, Tenn.Code Ann. § 40–35–115(b)(5) fully justifies the imposition of consecutive sentencing. The theory of the state characterizes this defendant as having sexually abused, over a significant period of time, the eight-year-old victim. Further, there was evidence at the sentencing hearing that the victim would suffer residual effects of the abuse.

■ Aggravated rape is a Class A felony. Tenn.Code Ann. § 39–13–502. As a Range I, Standard Offender, the defendant would have been eligible for a sentence of between 15 and 25 years. Tenn.Code Ann. § 40–35–105;

---

1. The first four criteria are found in *Gray*. A fifth category in *Gray*, based on a specific number of prior felony convictions, may enhance the sentence range but is no longer a listed criterion. *See* Sentencing Commission Comments.

Tenn.Code Ann. § 40–35–112(a)(1). While the defendant argues that the sentences are excessive, he makes no argument that the enhancement factors applied by the trial court are inapplicable. Certainly, the defendant, if guilty of these charges, violated a private, familial trust. *See* Tenn.Code Ann. § 40–35–114(15). A single enhancement would warrant an increase in the sentence above the minimum. We find no fault with the 16-½ year sentences.

### III

Finally, the defendant challenges the admissibility of the testimony of Bonnie Beneke, a licensed clinical social worker, who acted as a consultant with the Rape and Sexual Abuse Center in Nashville. Defense counsel objected to her as a witness claiming that the single aim of her testimony was to bolster the credibility of the victim. Counsel asserted that the jury did not need expert assistance in its resolution of the inconsistencies of the various statements made by the eight-year-old victim.

The trial court conducted a jury-out proceeding to determine first whether Ms. Beneke qualified as an expert witness and second whether the nature of the testimony would be admissible. After offering impressive credentials as an expert, Ms. Beneke was permitted by the trial court to testify in rebuttal to certain characteristics thought to be typical among child victims of sexual abuse. She referred both to concepts of "delayed disclosure" and "recantation" and described recantation as a "predictable phenomenon" in child abuse cases, most likely to occur in an intra-family situation.

After the jury-out hearing but before the evidence was presented to the jury, defense counsel again objected to the testimony of the witness. The trial court overruled the objection, ordered that the expert's opinion on recantation was admissible, and proposed a limiting instruction.

■ Generally, the allowance of expert testimony and the qualifications of expert witnesses are matters entrusted to the sound discretion of the trial court. There can be no reversal on appeal absent clear abuse of that discretion. *State v. Williams,* 657 S.W.2d 405, 411 (Tenn.1983).

Rule 702 of the Tennessee Rules of Evidence provides as follows:

If scientific, technical, or other specialized knowledge will substantially assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise.

■ In order to uphold the admission of expert testimony, four factors must appear in the record:

(1) The witness must be an expert;

(2) The subject matter of the witness' testimony must be proper;

(3) The subject matter must conform to a generally-accepted explanatory theory; and

(4) The probative value of the witness' testimony must outweigh its prejudicial effect.

*State v. Schimpf,* 782 S.W.2d 186, 191 (Tenn. Crim.App.1989).

In *Schimpf,* this court reversed the conviction for aggravated sexual battery when the state's case depended in significant part upon the testimony of Dr. Abraham Brietstein, who claimed expertness in the evaluation and treatment of sexually abused children. He described a child sexual abuse syndrome as "that group of signs and symptoms thought to be part of the post-incident experience of child victims of sexual abuse." *Id.* at 190. This court found that Dr. Brietstein's testimony involved "a scientific technique over which hangs an 'aura of special reliability and trustworthiness.'" *United States v. Amaral,* 488 F.2d 1148, 1152 (9th Cir.1973). Judge Adolpho A. Birch, Jr., speaking for a panel of this court, made several preliminary observations with respect to the character of the testimony admitted in *Schimpf:*

Several general principles of admissibility appear throughout our case law concerning expert testimony, and they are helpful in our subject matter analysis. They include the principles that the evidence must not invade the province of the jury; that the evidence should never be admitted unless it is clear that the jurors

themselves are incapable, for want of experience or knowledge on the subject, to draw correct conclusions from the facts proved; that the evidence should neither mislead nor confuse the jury; *and most importantly, the evidence should not relate to the credibility of the witnesses.*

*Id.* at 192 (emphasis added).

Our court found that the testimony in *Schimpf* should not have been admitted; the practical effect of the expert opinion was used only to buttress the credibility of the victim. Our court concluded that the probative value of the expert testimony was "substantially outweighed by the danger that it unfairly prejudiced, confused, or misled the jury." *Id.* at 195.

More recently, our supreme court approved of the rule established in *Schimpf.* In *State v. Ballard,* 855 S.W.2d 557 (Tenn. 1993), it held inadmissible the testimony of an expert who described the presence of post-traumatic stress syndrome as generally apparent in victims of child sexual abuse and exhibited by the victims in that particular case. In that case, Justice Charles O'Brien, speaking for the majority, made the following observations:

> This *"special aura" of expert scientific testimony, especially testimony concerning personality profiles of sexually abused children, may lead a jury to abandon its responsibility as fact-finder and adopt the judgment of the expert. Such evidence carries strong potential to prejudice* a defendant's cause by encouraging a jury to conclude that because the children have been identified by an expert to exhibit behavior consistent with post-traumatic stress syndrome, brought on by sexual abuse, then it is more likely that the defendant committed the crime. Testimony that children exhibit symptoms or characteristics of post-traumatic stress syndrome should not suffice to confirm the fact of sexual abuse. The symptoms of the syndrome are "not like a fingerprint in that it can clearly identify the perpetrator of the crime." *Expert testimony of this type invades the province of the jury to decide on the credibility of the witnesses.*

*Id.* at 561–62 (emphasis added) (citations omitted).

In our view, the discretion permitted trial courts to allow expert testimony is not absolute. If the discretion is arbitrarily exercised, there may be reversible error. *Baggett v. State,* 220 Tenn. 592, 598, 421 S.W.2d 629, 632 (1967). Justice O'Brien acknowledged the onerous burden placed upon courts in dealing with the sensitive issue of child sexual abuse:

> The problem of child sexual abuse is of great concern. . . . It is a critical problem to which we all must be sensitive. . . . [I]n fulfilling our duty to protect children from sexual abuse we should move cautiously and deliberately when considering fundamental changes in long-standing evidentiary rules.

*Id.* at 562.

The ultimate determination in *Ballard* was that "expert testimony describing the behavior of an alleged sexually-abused child is not reliable enough to 'substantially assist' a jury in an inquiry of whether the crime of child sexual abuse has taken place." *Id.* Moreover, Justice Daughtrey, who had dissented as a member of the panel of our court which decided *Schimpf,* concurred in the *Ballard* opinion because the expert testimony had been "too general to be of assistance to the jury that heard this case." We think that is the very circumstance here.

There are other cases published by our court which also appear to preclude the admission of the testimony given by Ms. Beneke. In *State v. Myers,* 764 S.W.2d 214 (Tenn.Crim.App.1988), our court held as error the admission of testimony regarding "behavioral dynamics of child abuse cases." In *State v. Dickerson,* 789 S.W.2d 566 (Tenn. Crim.App.1990), this court reversed a conviction based in part upon the testimony of a mental health therapist who had described a general child abuse syndrome. There are also several unreported cases on the subject. *See State v. Jerrell C. Livingston,* No. 01C01–9012–CR–00337, 1991 WL 181058 (Tenn.Crim.App., Nashville, September 17, 1991); *but see State v. Steven K. Sterna,* No. 01C01–9007–CR–00163, 1991 WL 135006 (Tenn.Crim.App., Nashville, July 24, 1991).

Taken collectively, these cases would appear to establish a relatively clear rule of law: child sex abuse may not be proven by evidence that the victim exhibited residual characteristics or behavioral traits similar to other victims of such abuse.

■ Here, the state's case rests entirely upon the credibility of the child victim, an alert, intelligent eight year old with a good command of our language. During direct examination, however, the victim admitted that he had told several of his relatives that he had made up the story before reasserting that his denials were untruthful. Ms. Beneke did not examine the child but testified that children who are sexually abused often recant their allegations. Ms. Beneke described recantation as "very common" and "a predictable phenomena" when children have been sexually abused. Finally, she asserted that child victims making false allegations of sexual abuse were "absolutely not" likely to reaffirm their initial claim after a recantation. The only possible value of these comments, in the context of the trial, was to accredit the testimony of the victim. The opinion of the expert fit to perfection the theory of the state.

And, despite the expert's acknowledgment that a recantation can take place because the original allegation of abuse was false and despite the trial court's contemporaneous instruction to the jury that the evidence was only "to inform the jury of this [recantation] phenomenon," we must find that the overall prejudicial effect outweighed the probative value of the testimony. In fact, if the testimony were not introduced by the state as a means of bolstering the child victim's testimony, it would have had no probative value at all. *See* D. Paine, *Tennessee Law of Evidence*, § 220 (1974).

Certainly, the state recognized that likelihood when it chose to use the witness at trial. The evidence clearly supported the theory of the prosecution. The concomitant danger, of course, was that the very claim of scientific basis was likely to be given inordinate weight by a trier of fact:

A courtroom is not a research laboratory. The fate of a defendant in a criminal prosecution should not hang on his ability to

successfully rebut scientific evidence which bears an "aura of special reliability and trustworthiness," although, in reality the witness is testifying on the basis of an unproved hypothesis in an isolated experiment which has yet to gain general acceptance in its field.

*United States v. Brown,* 557 F.2d 541, 556 (6th Cir.1977).

The admonition in *Ballard* was "that no one symptom or group of symptoms are readily agreed upon in the medical field that would provide a reliable indication of the presence of sexual abuse." 855 S.W.2d at 562.

This case involved a close factual issue. We cannot, therefore, find that the error was harmless. Absent Ms. Beneke's testimony, the results of the trial may have been different. The convictions must be reversed. Accordingly, we remand to the trial court for a new trial.

TIPTON, J., concurs.

WILLIAM, M. DENDER, Special Judge.

I respectfully dissent from the majority opinion.

Justice Daughtrey stated how our analysis begins in this type case in her dissent in *State v. Schimpf,* 782 S.W.2d 186, 196 (Tenn. Crim.App.1990), as follows:

Although analysis of the problem escalates rapidly into a state of juridical complexity, it begins on rather mundane territory with two well-established principles: first, that a trial court has broad discretion to admit or exclude expert testimony and, second, that the decision to allow such evidence cannot be disturbed on appeal unless there is a clear showing that the trial court has abused its discretion. *State v. Rhoden,* 739 S.W.2d 6, 13 (Tenn.Crim.App.1987). The trial court's discretion is not absolute, of course, and cannot be exercised as a matter of whim or caprice. Instead, the admissibility of expert testimony must be determined under an equally well-known standard—whether the evidence "will assist the trier of fact to understand the evidence or to determine a fact in is-

sue...." Federal Rule of Evidence 702. *See also* proposed Tennessee Rule of Evidence 702 ("substantially assist"); *see also City of Columbia v. C.F.W. Constr. Co.,* 557 S.W.2d 734, 742 (Tenn.1977).

Tennessee Rule of Evidence 702 is in effect at this time and is essentially the same as the stated federal rule with the exception that it contains the wording "substantially assist."

When we start with these simple principles, it seems to me that the majority opinion misses the point in this case as compared with the decision in *State v. Schimpf, supra.*

*State v. Schimpf, supra,* is relied upon by the majority as controlling in this case. I simply do not see that case as controlling, because that case involved testimony concerning "post-traumatic stress syndrome." The case *sub judice* involves testimony concerning "recantation."

It appears to me that there is a significant difference in expert testimony concerning "post-traumatic stress syndrome" and expert testimony concerning "recantation." The significant difference is that the testimony concerning "post-traumatic stress syndrome" is intended to prove the child has been the victim of child sex abuse; whereas, the testimony concerning "recantation" is simply an explanation of a phenomenon which occurs with children. Recantation is not a reliable indicator that the child has, or has not, been sexually abused; and it was not offered for such in this case.

The only time the testimony in this case tended to indicate that the child was the victim of child sex abuse was when Ms. Beneke testified that children who have recanted, in cases where nothing had happened, are not likely to reaffirm their initial position. (The child in this case had reaffirmed his original version of the incident.) *There was no contemporaneous objection.* The trial judge had allowed Ms. Beneke to testify after a hearing on a motion in limine; and in my opinion, all of her testimony is satisfactory except for this statement, and this statement had not come out in the hearing on the motion in limine. Under these circumstances, I believe it was necessary for there to be a contemporaneous objection in order

for this testimony to be considered for the purpose of reversing the action of the trial judge. If there had been a contemporaneous objection at this point in the evidence, the trial judge could easily have sustained the objection and given the jury proper instructions. See Tennessee Rule of Evidence 103(a) and the comments on that rule in Tennessee Law of Evidence, Second Edition (1990).

I do not consider Ms. Beneke's testimony as purely for the purpose of rehabilitating or bolstering the victim in this case; rather, I consider it to be allowed under Rule of Evidence 702, to "substantially assist the trier of fact to understand the evidence"; that is, the evidence that the child had recanted his initial version of the incident. I also believe Tennessee Rule of Evidence 704 specifically provides that such evidence is not to be disallowed just because it goes to the ultimate issue of the credibility of the child victim. Of course, the ultimate decision on the credibility of the witness lies with the jury; but that does not prevent expert evidence to assist the jury in "understanding the evidence" and making that ultimate decision.

I have reviewed *Sparkman v. State,* 469 S.W.2d 692 (Tenn.Crim.App.1970), which is the case cited in *State v. Schimpf, supra,* at 192, for the proposition that "most importantly, the evidence should not relate to the credibility of witnesses"; and I do not find these words or any implication that the case stands for that proposition. In fact, in *Sparkman* the defendant testified that he remembered "nothing from the time he ordered his second beer at Rogers' Shady Park Inn until he awoke in jail that afternoon," as well as numerous other statements concerning his mental difficulties and failing memory. A psychiatrist testified for the defense to the effect that the defendant "did not know the nature and quality of his acts nor that they were wrong"; but the jury found the defendant guilty, contrary to the opinion of the psychiatrist. The jury was allowed to hear the psychiatrist's testimony and consider it along with all of the other evidence. Clearly the credibility of the defendant was in question, and the testimony of the psychia-

trist related to the credibility of the defendant.

*Sparkman v. State, supra,* states:

Of course, it is settled beyond question that the weight and value of expert testimony is for the jury and must be received with caution. *Mullendore v. State,* 183 Tenn. 53, 191 S.W.2d 149. This applies to the expert opinions of medical men. *Crane Enamel Co. v. Jamison,* 188 Tenn. 211, 217 S.W.2d 945. Where there is any conflict between expert testimony and the testimony as to the facts, the jury is not bound to accept expert testimony in preference to other testimony, and must determine the weight and credibility of each in the light of all the facts shown in the case. *Act–O–Lane Gas Service Co. v. Clinton,* 35 Tenn.App. 442, 245 S.W.2d 795; *East Tennessee Natural Gas Co. v. Peltz,* 38 Tenn. App. 100, 270 S.W.2d 591. Expert medical opinion regarding the functioning of the human body must always be more or less speculative. *Patterson Transfer Co. v. Lewis,* 195 Tenn. 474, 260 S.W.2d 182; *Great American Indemnity Company v. Friddell,* 198 Tenn. 360, 280 S.W.2d 908.

The Tennessee Rules of Evidence became effective on January 1, 1990, and the opinion in *State v. Schimpf, supra,* was filed March 23, 1989, in the Court of Criminal Appeals. It seems to me that the Rules of Evidence certainly undermine any holding in that case that: (1) "the evidence must not invade the province of the jury" and (2) "the evidence should not relate to credibility of witnesses."

I realize that *State v. Ballard,* 855 S.W.2d 557 (Tenn.1993), solidifies the holding that it is error to allow the testimony of experts concerning "symptoms of post-traumatic stress syndrome" in child sex abuse cases. A careful reading of that case leads me to the opinion that the reason such testimony is not allowed is that it attempts to prove the guilt of the defendant. Testimony on "recantation" does not attempt to prove the guilt of the defendant. It will simply "substantially assist the trier of fact to understand the evidence" that the alleged child victim recanted.

This court has previously held that it was not error to allow a social worker for the Tennessee Department of Human Services to testify concerning the definition of "recantation." See the unreported opinion of this court in *State v. Steven K. Sterna,* No. 01C01–9007–CR–00163, 1991 WL 135006 (Tenn.Crim.App., Nashville, July 24, 1991).

I believe there is sufficient evidence in the record that the trial judge carefully considered the proposed evidence, exercised his discretion in a responsible manner in deciding that the evidence was competent after weighing the proposed evidence, and immediately after permitting the evidence to be entered in the trial gave a correct instruction to the jury. I do not believe that there has been "a clear showing that the trial court abused its discretion" in allowing such testimony, and I would affirm the convictions.