IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON

Assigned on Briefs September 12, 2007

## STATE OF TENNESSEE v. MARIO MORRIS

**Direct Appeal from the Criminal Court for Shelby County**
**No. 03-01051     James C. Beasley, Jr., Judge**

**No. W2006-02345-CCA-R3-CD  - Filed December 3, 2007**

The defendant, Mario Morris, was convicted by a Shelby County Criminal Court jury of four counts of aggravated robbery, a Class B felony, and one count of especially aggravated kidnapping, a Class A felony.  After merging the four counts of aggravated robbery into two counts, the trial court sentenced him as a Range I, standard offender to ten years at 30% for each of the aggravated robbery convictions and as a violent offender to twenty years at 100% for the especially aggravated kidnapping conviction.  Finding the defendant to be a dangerous offender, the trial court ordered that each of the sentences be served consecutively for a total effective sentence of forty years in the Department of Correction.  On appeal, the defendant challenges the sufficiency of the evidence and the trial court's imposition of consecutive sentencing.  Following our review, we affirm the judgments of the trial court.  However, because the record reveals that the defendant was improperly sentenced under the 2005 amendments to the 1989 Sentencing Act, we remand to the trial court for resentencing.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed and
Remanded for Resentencing**

ALAN E. GLENN, J., delivered the opinion of the court, in which DAVID H. WELLES and JOHN EVERETT WILLIAMS, JJ., joined.

R. Price Harris, Memphis, Tennessee, for the appellant, Mario Morris.

Robert E. Cooper, Jr., Attorney General and Reporter; Sophia S. Lee, Assistant Attorney General; William L. Gibbons, District Attorney General; and Stacy McEndree, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

## FACTS

On May 14, 2002, the kidnapping victim, Elisha Wilkins, was alone in her boyfriend's Memphis home when a group of armed men broke in demanding to know where the money was kept. After ransacking the home, the men took Wilkins' wallet and car keys, forced her into her vehicle, and drove her to the residence of her friend, LaTonya Cooper, who was home alone with her two young daughters. The men forced Wilkins at gunpoint to knock on the door and identify herself to Cooper, thereby gaining entry into the home. Once inside, the men searched the home, taking Cooper's cash, jewelry, vehicle, and other valuables.

The defendant and four codefendants were subsequently indicted in connection with the crimes, with the defendant and three of his codefendants charged with the especially aggravated kidnapping of Wilkins and the aggravated robberies of Wilkins and Cooper and the fourth codefendant charged with the facilitation of the crimes. On August 14, 2006, the case proceeded to trial against the defendant and two of his codefendants, Montreal Lyons and Khalfani Marion. Wilkins testified that on the evening of May 14, 2002, she was napping in the home of her boyfriend, Chris Winford, whom she had since married.[1] Awakened by a knock at the back door, she looked out the kitchen window and saw a man she did not recognize who asked her if Chris was home. She answered that he was not and began walking back to the den. Hearing a second knock, she returned to the door to find that the first man was now accompanied by a second, taller man who was armed with a gun. Next, seven or eight men broke in the residence demanding to know where the money was kept. According to Wilkins, at least half of these men were armed with guns. She stated that she told them she did not live there and did not know anything about any money. However, the men kept telling her that she should reveal the money's location because they were going to kill her anyway.

The men searched the home, taking Wilkins' wallet, identification, and the keys to her Isuzu Rodeo. The back door was open and Lyons instructed one of the men to watch her. At about the same time, Lyons told her that she was going to die because she had seen his face. She was then forced outside and into the backseat of her vehicle while four of the men, including the defendant, got into the vehicle with her. At that point, she noticed that a burgundy van was pulled in behind her vehicle. Wilkins testified that the men held her at gunpoint while they drove her to the home of LaTonya Cooper, whom she had met through Winford. At a later point in her testimony, she explained that Winford and Cooper's husband were co-owners of a bar and grill. She said that when she realized where the men were taking her, she began pleading with them for the sake of Cooper's children:

And when I discovered that we was going to La[T]o[ny]a Cooper's house, . . . I started begging and pleading with them telling them that she had two little girls. And I told them that they might kill me and her but just don't hurt the babies. And then

---

[1]At the time of trial, the witness's name was Elisha Winford rather than Elisha Wilkins. We will, however, refer to her by the name "Wilkins," since that was the name by which she was known at the time of the crimes and the name by which she was referred to throughout the trial.

that's when they was telling us that they didn't care about nothing, . . . the babies or nothing.

Wilkins testified that Lyons held a gun to the back of her head as he forced her to knock on the door and identify herself to Cooper. A second man stood beside her at the door while the rest of the men hid themselves. Cooper unlocked the door, and the men pushed Wilkins inside as they and their companions rushed in behind her. The same seven or eight men who had been in Winford's home came into Cooper's home.

Inside the home, the men initially separated the women, placing Wilkins in the bathroom and Cooper in a bedroom. As they searched the home, the men repeatedly asked the women where the money was kept and threatened to kill them. Cooper denied knowledge of any money, and Lyons said to the other men, "[Y]ou go in there and get one of them kids. I betcha they'll talk." At one point the telephone rang and the men forced Cooper to answer it, at the same time threatening to shoot her if she said the wrong thing. At another point, the defendant held the women at gunpoint together in one bedroom. Finally, before leaving, the men forced the women to lie face down together on the living room floor. Cooper's husband came home soon thereafter, and Wilkins stayed in the home until Winford arrived to take her back to his house, where they telephoned the police.

Wilkins estimated that the men were at Winford's house for half an hour to an hour and at Cooper's house for about the same amount of time. She said the houses were well-lit and she was within three feet of the men at both locations. On May 16, 2002, a police officer showed her a photographic spreadsheet from which she positively identified the defendant, Mario Morris, as one of the perpetrators. On June 8, 2002, she recognized one of the codefendants, Khalfani Marion, at the Greyhound bus station and immediately contacted a security officer, who called the police. On September 13, 2002, she positively identified another codefendant, Montreal Lyons, from a photographic spreadsheet she was shown by the police. Wilkins testified that she particularly remembered a scar on Lyons' neck, which was not depicted in the photograph. She made positive courtroom identifications of each of the three defendants and said that she had also identified each one at earlier preliminary hearings.

On cross-examination, Wilkins testified that some of the men were wearing masks but that the three defendants on trial were not. She acknowledged that both she and Cooper were upset and frightened and that things were chaotic in the home during the incident. She stated on redirect, however, that she was certain of her identification of all three defendants.

LaTonya Cooper testified that she was in bed watching television and her five-and-six-year-old daughters were asleep in their bedroom when the doorbell rang shortly after 10:30 p.m. on May 14, 2002. She went to the door and asked who was there. When Wilkins identified herself, Cooper turned the alarm off and opened the door to find not only Wilkins but "a whole bunch of guys with guns" at her doorstep. Cooper later estimated that there were five or six men present and testified that she recalled seeing three guns. She said she stepped backwards and raised her hand as the men came into the house and locked the door behind them. She stated that she asked the men not to wake

her daughters, and Marion instructed her to close their bedroom door. When she returned, the men were moving around the house and asking for money and jewelry.

Cooper testified that she gave the money in her purse to Marion, who accompanied her to her bedroom to retrieve it. She said that Lyons, who thought she should have more money, kept threatening to kill her, her daughters, and Wilkins and suggested that she could produce more money if he brought her daughters out of their bedroom. In response, she told him that she would not endanger her children's lives by withholding any money from him. Marion then took her back into the bedroom while he rummaged through her dresser. Cooper testified that Wilkins was later brought into the bedroom with her. She stated that the telephone rang at one point and Lyons made her answer it, at the same time instructing the defendant to shoot her if she said anything wrong. At another point, someone knocked on the door and Marion instructed her to answer it, telling the defendant to "spray her ass" if she tried to run. When she opened the door to find no one there, Marion told her to close the door.

Cooper testified that it seemed to her as if the men were in her home "forever." She said that before they left, they brought her and Wilkins out of the bedroom and ordered them to lie face down on the living room floor. Because she believed that she and Wilkins were about to be killed, she pleaded for the men to take them outside where her children would be unable to see or hear the murders. Lyons responded that she could either lie down or he would shoot her down. After she had complied, the men instructed her and Wilkins to start counting and then left through the back door. A minute or so later, she and Wilkins got up and she telephoned her husband, who came home and telephoned the police. According to Cooper, the men took her DVD player, money, laptop computer, jewelry, and vehicle.

Cooper testified that some of the men wore masks, but the three defendants on trial did not. The lights were on in the house and the men were as close as two feet at times. She said she identified the defendant, Marion, and Lyons from photographic spreadsheets she was shown on May 16, 2002, June 8, 2002, and September 21, 2002, respectively. She stated that she was not with Wilkins when Wilkins recognized Marion at the bus station. She agreed that she positively identified the defendant and Marion at a July 3, 2002, preliminary hearing and said that she informed police the night of the incident about Lyons' large scar on his neck, which was not visible in his photograph. Cooper made positive courtroom identifications of all three defendants.

On cross-examination, Cooper acknowledged that things were chaotic during the time of the robbery. She reiterated that it seemed like the men were in her home for a long time and did not respond when asked if she would be surprised to learn that Wilkins and Winford had telephoned the police from Winford's home at 11:14 p.m.

Shelby County Sheriff's Deputy Jason Long, who was dispatched to Cooper's home early on the morning of May 15, 2002, testified that he took an initial report about the incident and noted that the house was in disarray. Memphis Police Officer John Chevalier, who was dispatched to Winford's home before midnight on May 14, 2002, and Lieutenant Daniel Parris, the crime scene

-4-

unit officer who responded to the same address, each testified that the back door to Winford's home had been kicked in and that the house appeared to have been ransacked.

Lieutenant Larry Skaggs of the Memphis Police Department testified that he was working downtown on the night of June 8, 2002, when a nervous, frightened woman approached him and said she had just recognized a man at the bus station as someone who had broken into her home and robbed her. After obtaining a description of the suspect, he went to the bus station, where he arrested Khalfani Marion. Lieutenant Connie Maness of the Memphis Police Department testified that she showed Wilkins a photograph of Marion later that same night and asked whether she was sure he was the man who had committed the home invasion. She said that Wilkins answered in the affirmative.

Sergeant Timothy Green of the Memphis Police Department, who was assigned to the Robbery Division in 2002, testified that he was the lead officer assigned to the case. On May 16, 2002, he showed both victims a six-person photographic spreadsheet from which each victim positively identified the defendant, Mario Morris. He said that he conducted the identifications at separate times and neither victim knew which photograph the other had chosen. He stated that Wilkins chose the defendant's photograph within five or six seconds of being shown the photographic array. He could not recall how long Cooper took but said that she also identified the defendant, circling his photograph and writing that he had not been wearing a mask. He testified that he showed Cooper another six-person photographic spreadsheet on June 8, 2002, from which she "pretty quickly," identified Khalfani Marion by circling his photograph. At separate times, he also showed each victim a six-person photographic spreadsheet from which each identified Montreal Lyons. He said that the victims were certain in their identifications and each also mentioned the large scar on Lyons' neck, which was not visible in the photograph.

Sergeant Green testified that he determined through the course of his investigation that all three defendants currently on trial were living in the same apartment complex at the time of the robberies. He acknowledged that five of the suspects in the case had provided Lyons' name as a person involved in the crimes. He said that another codefendant, not currently on trial, was arrested the same day as the crimes and provided a narrative to him about the events that had transpired. On cross-examination, he acknowledged that no fingerprints had been obtained in connection with the case.

Each of the three defendants elected not to testify and rested their cases without presenting any proof. The only witness at the September 14, 2006, sentencing hearing was LaTonya Cooper, who testified that she had lived in a state of constant fear since the ordeal. She said she had trouble sleeping, was constantly worried about the safety of her children, and had never again lived in her home after the crimes. Over the objection of defense counsel, Cooper testified that on the night of the crimes Wilkins told her that one of the men had put a gun in her mouth while she was standing on Cooper's porch, frightening her so much that she had urinated.

The trial court found one enhancement factor applicable to all of the crimes: that the defendant was a leader in the commission of the offenses. See Tenn. Code Ann. § 40-35-114(2) (2006). The trial court found the enhancement factor that the defendant treated a victim with exceptional cruelty applicable to the aggravated robbery conviction involving Cooper, and the enhancement factor that the defendant had no hesitation in committing a crime when the risk to human life was high applicable to both robbery convictions. See id. § 40-35-114(5), (10). The trial court found no applicable mitigating factors. The trial court then sentenced the defendant as a Range I, standard offender to ten years for each of the aggravated robbery convictions and to twenty years as a violent offender for the especially aggravated kidnapping conviction. Based on its finding that the defendant was a dangerous offender, the trial court ordered that each of his sentences be served consecutively, for an effective forty-year sentence in the Department of Correction.

## ANALYSIS

### I. Sufficiency of the Evidence

As his first issue, the defendant challenges the sufficiency of the convicting evidence. Specifically, he contends that there was insufficient evidence to establish his identity, arguing that the State's only evidence linking him to the crimes was the "tearful testimony" of the victims, which was so inconsistent and full of gaps as to "warrant a finding by this court that each and every element of each and every charge was not proven beyond a reasonable doubt." The State argues that the victims' eyewitness identifications of the defendant were sufficient to establish his identity as one of the participants in the crimes. We agree with the State.

When the sufficiency of the convicting evidence is challenged on appeal, this court must consider "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the offense charged beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); see also Tenn. R. App. P. 13(e) ("Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt."); State v. Evans, 838 S.W.2d 185, 190-92 (Tenn. 1992); State v. Anderson, 835 S.W.2d 600, 604 (Tenn. Crim. App. 1992). The same standard applies whether the finding of guilt is predicated upon direct evidence, circumstantial evidence, or a combination of direct and circumstantial evidence. State v. Matthews, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). On appeal, the State is entitled to the strongest legitimate view of the evidence and all inferences therefrom. State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). A jury conviction removes the presumption of innocence with which a defendant is initially cloaked and replaces it with one of guilt, so that on appeal, a convicted defendant has the burden of demonstrating that the evidence is insufficient. See State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982); State v. Grace, 493 S.W.2d 474, 476 (Tenn. 1973).

All questions involving the credibility of witnesses, the weight and value to be given the evidence, and all factual issues are resolved not by this court, but by the trier of fact. See State v.

Pappas, 754 S.W.2d 620, 623 (Tenn. Crim. App. 1987). This court may not reweigh or reevaluate the evidence. Cabbage, 571 S.W.2d at 855. Our supreme court stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

Bolin v. State, 219 Tenn. 4, 11, 405 S.W.2d 768, 771 (1966) (citing Carroll v. State, 212 Tenn. 464, 370 S.W.2d 523 (1963)). "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." Grace, 493 S.W.2d at 476.

In the light most favorable to the State, the evidence was sufficient to establish beyond a reasonable doubt that the defendant was one of the perpetrators of the crimes. The identity of an accused may be established by either direct evidence, circumstantial evidence, or a combination of the two. State v. Thompson, 519 S.W.2d 789, 793 (Tenn. 1975). The determination of identity is a question of fact for the jury to determine after consideration of all the evidence. State v. Strickland, 885 S.W.2d 85, 87 (Tenn. Crim. App. 1993). Regarding the identity of an accused, "the testimony of a victim, by itself, is sufficient to support a conviction." Id. (citation omitted). Both victims testified that they viewed the men, including the defendant, at close proximity in well-lit areas. The defendant's face was not masked, and each victim was therefore able to get a good look at his features. Both victims chose the defendant's photograph out of a six-person photographic spreadsheet, and both identified him at the preliminary hearing. Finally, both victims positively and unequivocally identified the defendant at trial as one of the participants in the crimes. "The credible testimony of one identification witness is sufficient to support a conviction if the witness viewed the accused under such circumstances as would permit a positive identification to be made." State v. Radley, 29 S.W.3d 532, 537 (Tenn. Crim. App. 1999).

Although the victims' accounts varied in some instances, particularly with respect to the number of men involved, they were remarkably similar in other details. Moreover, the credibility of witnesses, the weight to be afforded their testimony, and the reconciliation of conflicts in the evidence are matters entrusted to the jury as the trier of fact. State v. Anderson, 880 S.W.2d 720, 726 (Tenn. Crim. App. 1994) (citing Byrge v. State, 575 S.W.2d 292, 295 (Tenn. Crim. App. 1978)). It was well within the province of the jury to accredit the testimony of Wilkins and Cooper identifying the defendant as a perpetrator of the crimes. In sum, we conclude that the evidence was sufficient to sustain the defendant's convictions.

## II. Consecutive Sentencing

The defendant also contends that the trial court erred by imposing consecutive sentencing. When an accused challenges the length and manner of service of a sentence, it is the duty of this court to conduct a *de novo* review on the record with a presumption that "the determinations made by the court from which the appeal is taken are correct." Tenn. Code Ann. § 40-35-401(d). This presumption is "conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances." State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991). The party challenging the sentence imposed by the trial court has the burden of establishing that the sentence is erroneous. Tenn. Code Ann. § 40-35-401, Sentencing Commission Cmts.; Ashby, 823 S.W.2d at 169. The burden, therefore, falls on the defendant to show that the consecutive sentencing imposed by the trial court is erroneous.

The trial court based its imposition of consecutive sentencing on a finding that the defendant was a dangerous offender. Tennessee Code Annotated section 40-35-115 provides that a trial court may in its discretion impose consecutive sentencing when it finds any one of a number of different factors by a preponderance of the evidence, including that the defendant is a dangerous offender whose behavior exhibits little or no regard for human life and no hesitation about committing a crime in which the risk to human life is high. Tenn. Code Ann. § 40-35-115(b)(4). When a trial court bases consecutive sentencing upon its classification of the defendant as a dangerous offender, it is required to make further findings that the aggregate length of the defendant's sentence reasonably relates to the severity of his offenses and is necessary to protect the public from further criminal conduct of the defendant. State v. Lane, 3 S.W.3d 456, 460-61 (Tenn. 1999); State v. Wilkerson, 905 S.W.2d 933, 937-38 (Tenn. 1995).

The defendant argues that the trial court erred by failing to make the additional Wilkerson findings, by finding that he "refused to live a productive life" and "resorted to criminal activity to further his anti-societal state" and by relying on Cooper's hearsay account of what had happened to Wilkins while she was standing on the porch of Cooper's home. The State argues, among other things, that the trial court made the appropriate findings under Wilkerson and properly admitted the challenged portion of Cooper's testimony under the excited utterance exception to the rule against hearsay. We agree with the State.

The record reveals that the trial court recited the applicable statutes and case law, including the required Wilkerson factors, prior to making the following findings:

> The Court has already found and will reiterate the fact that the Court finds that the circumstances surrounding the commission of these offenses was aggravated. The Court also finds that the aggregate length of the sentences reasonably relate[s] to the offense for which the defendants stand convicted and also the Court finds that confinement for an extended period of time is necessary to protect society from the defendant's unwillingness to lead a productive life and the defendant's resort to criminal activity in furtherance of an anti-societal lifestyle.

This Court finds that there is absolutely nothing to indicate that any of these three defendants has done anything that indicates anything other than an anti-societal lifestyle[;] . . . that they have . . . resorted to this criminal activity in furtherance of their lifestyle[;] that this is an aggravated crime, a series of crimes is very aggravated as previously outlined by this Court and that the length of sentence imposed does in fact relate to the serious nature of this offense.

The Court feels that each of these three individuals is a very dangerous offender to our society, a dangerous offender within our community. The very nature of these crimes, the very manner in which they were carried out wreaked terror and havoc within our community.

Contrary to the defendant's suggestion, although the trial court referred to the three defendants' anti-societal lifestyle, it neither explicitly nor implicitly found that the defendant qualified as a professional criminal under the consecutive sentencing statute. To the contrary, the trial court specifically noted in its application of enhancement factors that the defendant's prior criminal history consisted of a single conviction for driving with a revoked license. Instead, the trial court focused on the aggravated nature and circumstances of the crimes in finding that the defendant was a dangerous offender. Based on our review of the record, we cannot conclude that the evidence preponderates against this finding. The defendant and his codefendants terrorized Cooper and Wilkins by invading their respective homes, holding them at gunpoint, kidnapping Wilkins, and threatening to kill not only the women but also Cooper's two young children.

We also find no error in the trial court's allowance of Cooper's challenged testimony. The prosecutor explained to the trial court that she had contacted Wilkins, who had informed her that she was in the process of attempting to get to the hearing from her job in Mississippi. The prosecutor said, however, that she did not believe that Wilkins would reach the hearing on time and argued that the statement was admissible as an excited utterance. The trial court allowed the proposed testimony, stating that it would not consider it if it found that it consisted of something that was inappropriate. It is well-settled in Tennessee that a trial court has the authority to admit trustworthy and probative evidence, including hearsay, for sentencing purposes. See State v. Flynn, 675 S.W.2d 494, 498 (Tenn. Crim. App. 1984); Tenn. Code Ann. § 40-35-209(b). We conclude, therefore, that the trial court properly admitted the statement as an excited utterance.

We note that the trial court apparently sentenced the defendant, who committed the crimes in 2002, under the 2005 amendments to the 1989 Sentencing Act. A defendant who is sentenced after June 7, 2005, for a crime committed on or after June 1, 1982, may elect to be sentenced under the 2005 amendments by executing a waiver of his *ex post facto* protections. See Tenn. Code Ann. § 40-35-210(c), Compiler's Notes. The record in this case, however, contains no waiver of the defendant's *ex post facto* protections. We must, therefore, remand to the trial court for resentencing. On remand, the trial court should either appropriately resentence the defendant under the old law or ensure that the defendant executes a waiver of his *ex post facto* protections in order to be sentenced under the 2005 amendments to the Sentencing Act.

## CONCLUSION

      We conclude that the evidence was sufficient to sustain the defendant's convictions and that the trial court did not err in its imposition of consecutive sentencing. Accordingly, we affirm the judgments of conviction and the imposition of consecutive sentencing. However, because the defendant was improperly sentenced under the 2005 amendments to the Sentencing Act, we remand to the trial court for appropriate resentencing in accordance with this opinion.

_____
ALAN E. GLENN, JUDGE