IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE

## STATE OF TENNESSEE v. JASON C. CARTER, ET AL.

**Direct Appeal from the Criminal Court for Davidson County**
**No. 97-A-37     Seth Norman, Judge**

---

**No. M1998-00798-CCA-R3-CD - Decided April 27, 2000**

---

The defendants appealed their convictions for the especially aggravated robbery of the two victims and vandalism of the car of one of the victims. Additionally, Carter was convicted of the unlawful possession of a weapon. In their appeal, the defendants assert that the trial court should have instructed as to lesser-included offense of aggravated assault, that the proof of especially aggravated robbery was not sufficient, and that their sentences were inappropriate. Based upon our review, we reverse the convictions of both defendants as to especially aggravated robbery because of the failure to instruct the jury as to the lesser-included offense of aggravated robbery. The remaining convictions are affirmed.

**Tenn. R. App. P. 3; Judgment of the Criminal Court is Affirmed in Part and Reversed in Part.**

GLENN, J., delivered the opinion of the court, in which TIPTON, J., and RILEY, J., joined.

Lionel R. Barrett, Jr., Nashville, Tennessee, for the appellant, Jason C. Carter
Paul J. Bruno, Nashville, Tennessee, for the appellant, Richard D. Tucker.

Paul G. Summers, Attorney General and Reporter, Daryl J. Brand, Assistant Attorney General, Victor S. Johnson, III, District Attorney General, and James W. Milam, Assistant District Attorney General, for the appellee, State of Tennessee.

### OPINION

The defendants, Jason C. Carter and Richard D. Tucker, appeal as of right from their jury convictions in the Criminal Court of Davidson County on two counts of especially aggravated robbery, a Class A felony, and one count of vandalism. Additionally, defendant Carter was convicted of the unlawful possession of a weapon. Defendant Carter was sentenced to twenty-two years imprisonment on each especially aggravated robbery conviction to run consecutively for a total effective sentence of forty-four years. His three-year sentence for vandalism and two-year sentence for the unlawful possession of a weapon were to be served concurrently. Defendant Tucker was sentenced to two years for vandalism and nineteen years imprisonment on each especially aggravated robbery conviction. The especially aggravated robbery sentences were to be served consecutively,

while the vandalism sentence was to be concurrent, for a total effective sentence of thirty-eight years. Defendants present the following issues:

I.     Whether the court erred in failing to instruct the jury on the lesser-included offense of aggravated assault;

II.    Whether there was sufficient evidence to support convictions for especially aggravated robbery; and

III.   Whether the total effective sentences imposed are excessive.

Based upon plain error, the failure to instruct as to aggravated assault, we reverse the convictions of both defendants for especially aggravated robbery and remand for new trials, affirm the convictions of Carter for vandalism and unlawful possession of a weapon, and affirm the conviction of Tucker for vandalism.

## PROCEDURAL BACKGROUND

The Davidson County Grand Jury returned indictments charging the defendants with two counts of especially aggravated robbery and one count of vandalism. Additionally, Carter was indicted for unlawful possession of a deadly weapon. Defendants pleaded not guilty to all charges. The case was tried for four days in September 1997, before a jury which returned a verdict finding the defendants guilty as charged on all counts.

## FACTS

The two victims and the two defendants in this case were young men in their twenties who lived in Nashville. Trial testimony concerning the events of Friday night and early Saturday morning, July 12-13, 1996, makes a truthful version difficult to sift from the testimony. Nevertheless, the record does support the following sequence of events. The victims, Dean Bell and Rodney ("Porky") Durham, high school friends, were at Shooter's, a sports bar in the Hermitage area of eastern Nashville, on Friday night, July 12, 1996. When they left Shooter's sometime after midnight, Durham was driving his red Nissan and Bell was in the front passenger seat. The two were looking for a place to get something to eat when Durham's beeper went off. They pulled into an Arby's where a pay phone was situated in front of the parking area, close to Lebanon Road, so that Durham could answer the call, which he said was from his girlfriend. Although the Arby's was closed, the area was well-lit. While Durham and Bell were looking for change, a small white car with two young men in it pulled up alongside.

There is contradictory testimony as to whether the four men knew each other. Bell testified that he did not know either of the defendants, but that "[w]ell, I had seen one of them, maybe, just his face looked familiar maybe." Durham testified that he did not know or recognize either defendant. Carter, on the other hand, testified that he had been drinking at Shooter's with the two

-2-

victims earlier in the evening.

Defendant Tucker was positively identified by both victims as the driver of the white car and defendant Carter was identified as the passenger. Carter denied that he was at Arby's during the evening or early morning hours when the robbery occurred. Tucker did not testify during the trial.

Dean Bell, the passenger in Durham's car, testified that Carter got out of the white car and reached through the window of the driver's side of Durham's car, across Durham, and tried to grab the keys. Durham and Carter struggled, with the defendant trying to drag Durham from the car. Bell testified as to what happened next:

> I grabbed the car door and I was going to get out and go around the car, and someone come on my side of the car. The driver from the other car had evidently walked over and pointed a gun at my head while I was still sitting in the car. . . . [H]e said, give me your wallet. . . . I reached back with my right arm to pull my wallet out and he smacked me across the face with the gun.

Bell then described his appearance as he looked up, "I had already had blood all over me because it busted my mouth wide open." Questioned by General Milam, Bell testified to the following:

> Q. Now, what did they do to Mr. Durham when they got him out of the car?
>
> A. They hit him and grabbed a chain he had on his neck, a little gold chain. And grabbed his wallet and tried to get his money, or whatever. And he hit him on the head with the revolver, and hit him a few times and just . . .
>
> Q. Did Mr. Durham, did he have any weapon of any kind?
>
> A. No.
>
> Q. Did you have any weapon of any kind?
>
> A. No.
>
> Q. Were you able to punch either of these people or . . .
>
> A. No.
>
> Q. Okay. When they got Mr. Durham out of the car did you see him resist?

A. No.

Q. Okay, what happened to him after they hit him over the head with the gun?

A. Well, they grabbed his chain, and they hit him over the head, and they got his wallet out, and they struck him a few more times, and they kind of knocked him down and he was kind of unconscious, or he wasn't alert.

Bell, who had stayed seated in the car, yelled at the defendants to stop hitting and kicking Durham. They then turned on Bell, demanding his wallet. Bell had hidden his recently cashed paycheck for approximately $550 in a secret compartment of his wallet. When the defendants expressed their anger that only $20 to $30 was in the wallet, Bell attempted to pull out more money and in so doing smeared the contents of the wallet with his blood. Bell testified that Carter yelled "just shoot him" to Tucker. Bell also testified that he was forced to pull a gold nugget ring from his finger and give it to the defendants.

Once the defendants had gotten back in the white car and started to drive off, Bell pulled Durham into the red car and then started to use the pay phone. The defendants, seeing this, turned back and yelled for Bell to put the phone down. This time, before driving out of the Arby's parking lot, the defendants vandalized Durham's car by smashing the rear window and repeatedly kicking the side and door of the car. Once the defendants drove off, Bell drove in the opposite direction to the apartment of a friend, Eric Hargrove, at Arbour East Apartments.

Another friend, Ralph David Tyree, testified that he was also going to visit Hargrove and was just walking to the door when the victims drove up and parked. Tyree said that he "could see that the guys were covered in blood." Tyree also testified that Durham asked him to go back to Arby's and look for his class ring. According to Tyree, Durham said that "he tossed it up under the car so it wouldn't get taken."

At Eric Hargrove's apartment, the victims attempted to assess the extent of their injuries. Hargrove testified that Bell had "a very huge gash across his lip. He had blood all over him. His shirt was covered in blood." Hargrove saw Durham sitting outside and "he had a towel on his head and I actually gave him another towel of mine. He was bleeding through the one towel. And it was dripping down his face." Hargrove and Tyree convinced them to let Hargrove drive them to Summit Medical Center, approximately one-half mile back the way they had just come. The victims arrived at the emergency room at Summit at 1:39 a.m. and were treated by Dr. Robert Roth.

Bell testified that he "had to have stitches right here on my top lip. It was - - had a wide gash. From my bottom lip from here to there (indicating) I had to have stitches there. And on the back of my ear, on both sides of my ear, I had to have stitches. And where I got kneed in the groin the doctor had to look at that because it was swollen."

-4-

Dr. Roth testified that Bell had "roughly four lacerations. There was a, what we call a trap door type laceration in the area just below his nose. And then there was a check or a L-shaped laceration below his left lip and extending laterally." Bell also had a laceration on the front of his left ear and a "through and through" laceration behind the left ear. Dr. Roth found Bell's lacerations consistent with blows from a handgun. Dr. Roth testified that Bell's lacerations were "cosmetically disfiguring." Dr. Roth also found swelling of the left testicle consistent with Bell's complaint of being kicked in the groin area. Bell was discharged after approximately four hours.

Rodney Durham testified that once he was out of the car, defendant Tucker, who had been on Bell's side of the car, came over to him and "hit me in my mouth, hit me up the side of my head." Durham further testified that Tucker used the barrel end of the gun. When asked how he was hit in the head, Durham testified, "I don't know, I just went to the ground and that's all I really know. I know it had to be with the gun." Durham recalled pleading with the defendants, "don't shoot me, please, don't shoot me." Durham also recalled being helped into the car by Bell after the attack and going to Hargrove's apartment, but he was confused about what had happened until he arrived at the hospital where he received stitches in his head and mouth.

Dr. Roth testified concerning the injuries sustained by Durham:

> He had a two and a half inch scalp laceration over the crown or the cranial aspect of the head which is the sagittal or midline aspect of the head. And there was a fairly large clot in the wound at the time.
>
> He also had a T-shaped laceration over the lateral aspect of his mouth, the corner of his mouth. He had some abrasions to his shoulders and bony prominences, for instance, the elbow, the knee, and things like that.
>
> . . . .
>
> The laceration on the head, the scalp laceration, is not a fist laceration. To sustain a burst or a blow-out type laceration of the scalp, you have to be hit fairly hard with either an object or your head run into an object, something fairly firm, that would cause the implosion. A punch would never cause that type of laceration.

Dr. Roth prescribed both antibiotics and pain medication for Durham. Because of the type of wound sustained by Durham, an X-ray was required to determine that he had not suffered an injury to the skull itself. Durham was released after approximately two hours.

While at the hospital, Bell and Durham were questioned by police officers and gave consistent descriptions of the defendants and of the white car with a temporary tag in the rear window. Bell told police that neither of their assailants wore a shirt. Police dispatchers broadcasted

the descriptions, and a report came in shortly thereafter that two individuals and a car matching the description had been spotted at a Kroger store on Old Hickory Boulevard in Hermitage. The call from Kroger was the result of two encounters between the defendants and employees at the Kroger. Earlier that night, at about 11:00 p.m., employees had observed two, young, shirtless men who came into the store and then left. Approximately two hours later, they both returned, this time wearing shirts. One man now had blood on his pants and a bandana wrapped around one of his hands. Employee Jeff Fitzgerald saw a bulge under the shirt of one of the individuals, and a gun was exposed when the man moved. Fitzgerald positively identified defendant Carter as one of the two men at the store but was unable to identify defendant Tucker or testify as to which defendant had the gun.

After observing the two men get into a four-door, white car with a temporary tag and circle suspiciously around the parking lot, the Kroger night manager called the police. By the time Officer Ronald Steele of the Metro Police Department arrived at the Kroger store, the car was gone. Officer Steele decided to check out all the "drive-up" markets in the area. He was looking for a white, four-door sedan driven by two white males with a drive-out tag in the rear window.

Officer Steele soon spotted the car at a nearby RaceTrac gas station. One of the occupants had gone to the cashier's window, while the other was in the car when the officer approached. Officer Steele saw a pistol, which he later identified as a Ruger Security Six .357 revolver, on the driver's side floorboard. Based on the description of the individuals and of the vehicle and the presence of the gun, the officer took into custody the occupant, defendant Carter. The other man, whom Officer Steele identified as defendant Tucker, ran into a nearby wooded area and disappeared. Dean Bell's bloodstained wallet was found in the backseat of the white car. Several days later, after the victims had given positive identifications of the defendants from photographic lineups, the police arrested both defendants pursuant to aggravated robbery warrants at the residence of defendant Tucker's girlfriend at Arbour East Apartments.

Of the two defendants, only Carter testified during the trial. He denied that he had been at the Arby's that evening or that he had robbed either of the victims. Carter said that he had known the victim, Rodney "Porky" Durham, since they were young boys playing on a football team. Carter testified that he, Durham, and Bell, had all been drinking together at Shooter's on the evening of July 12, 1996; that they were "regulars" there; and that they all left together to sit in Carter's car and smoke marijuana. Carter testified further that Durham and Bell wanted to go to another bar, but he did not want to drive around in his car since he did not have a valid license. The plan was for Durham and Bell to follow Carter to Arbour East Apartments where Carter said he would leave his car with a friend, who was the co-defendant, Tucker. Once there, the three walked to the apartment where Tucker lived. Carter testified to the following events once Tucker opened the door and Durham saw who it was:

> [H]e [Durham] went up under his shirt. It was a beige shirt. I seen a chrome gun. Then Richard [Tucker] hit him. They start[ed] fighting. Mr. Bell tried to jump on Richard's back. I grabbed Mr. Bell. Mr. Bell then swung at me. I ducked. He hit the wall. He was

kind of in a scrunched position, points down like his hand was hurting, and then I tackled him. We fell against the rail.

. . . .

I was on top of his back, and I was striking him in the face. I was hitting him. He elbowed me. I kind of fell off. He got up and started to run. I kicked his leg, and he fell up against a brick wall. . . . It's like this concrete wall, and it cuts, and it's a rail right there. Where the steps are going downstairs, there's a rail. Then Richard's door is right here.

Defendant Carter testified that the gun which Durham pulled out of his shirt fell on the ground. After Durham and Bell left, Carter testified that he went to another friend's house to find out if he knew of anyone who would buy the gun. An individual Carter identified as "Troy" answered the door. Carter testified that it was Troy who was in the car with him later at Kroger's and who ran into the woods at the RaceTrac gas station in the early morning hours of July 13. Carter testified that he did not know Troy's last name or his whereabouts. Carter was asked by defense counsel, "Were you ever involved in a fight or robbery with these, Mr. Bell and Mr. Durham, at Arby's over on Lebanon Road?" Carter responded, "No, sir."

Defendant Tucker did not testify at trial, but his sister, Lynn Green, and her husband, Mark Green, both testified, describing a sequence of events that corroborated the testimony of defendant Carter concerning a fight at Tucker's apartment. Ms. Green testified that she, her husband, Tucker, and Tucker's girlfriend were all at Tucker's apartment at Arbour East when someone knocked on the door at about 12:30 a.m. on July 13, and Tucker went to the door. Ms. Green further testified:

Well, there was two guys standing there I didn't know when we first opened the door. And one of them had - - he raised up his shirt when he saw Richard come to the door. And he had a gun at the top of his pants, and he said, "I know who you are. You are - - you're the" - - then he said a cuss word, M.F. - - "that ripped me off a long time ago." And then Richard pushed him out the door, and they started fighting.

Mark Green, a four and one-half-year veteran of the United States Marine Corps, testified that he heard the fighting and heard his wife, who had gone outside with Tucker, "yell he's got a gun." Green testified that he then grabbed his one-year-old son and went into the kitchen with Tucker's girlfriend and her daughter for safety, leaving his wife at the front of the apartment. He remained in the kitchen for approximately twenty to thirty minutes, until his wife and Tucker came into the kitchen. He did not telephone the police.

## ANALYSIS

### I. Evidence as to Serious Bodily Injury

Defendants contend that the State failed to prove that the victims sustained serious bodily injury, and therefore the evidence presented at trial was insufficient for a conviction for especially aggravated robbery. Our standard of review, when the sufficiency of the evidence is challenged by defendants, is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979). It is not our prerogative to reweigh the evidence. Rather, we presume that the jury has resolved all conflicts in the testimony and drawn all reasonable inferences from the evidence in favor of the State. See State v. Sheffield, 676 S.W.2d 542, 547 (Tenn. 1984); State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978).

"Serious bodily injury" is defined by statute in the following way:

"Serious bodily injury" means bodily injury which involves:

    (A)   A substantial risk of death;

    (B)   Protracted unconsciousness;

    (C)   Extreme physical pain;

    (D)   Protracted or obvious disfigurement; or

    (E)   Protracted loss or substantial impairment of a function of a bodily member, organ or mental faculty[.]

Tenn. Code Ann. § 39-11-106(34).

Previously, this court has considered whether a victim's injuries could be classified as "serious bodily injury." In State v. Zonge, 973 S.W.2d 250, 255 (Tenn. Crim. App. 1997), perm. app. denied (Tenn. 1998), the victim of a burglary had "suffered bruises to her shoulder and back,

a knot on her head, and four stitches." Concluding that the pain associated with these injuries was "not of the same degree as that associated with the other classifications of serious bodily injury," the court modified the defendant's conviction from especially aggravated burglary to aggravated burglary. Id. The court considered the State's argument that these injuries resulted in "extreme physical pain":

> This court addressed a similar argument in *State v. Sims*, 909 S.W.2d 46 (Tenn. Crim. App. 1995). The victim in *Sims* received a broken nose, a bruised cheekbone, black and blue eyes, and a laceration across the bridge of her nose. Applying the *ejusdem generis* canon of statutory construction, this court explained that the extreme physical pain definition of serious bodily injury must be read as applying to the same class of injuries as those causing a substantial risk of death, protracted unconsciousness, protracted or permanent disfigurement or the loss of impairment of the use of a bodily member, organ or mental faculty. *Sims*, 909 S.W.2d at 49. Because the proof in *Sims* did not establish the type of extreme physical pain necessary to support a finding of serious bodily injury, this court modified the defendant's conviction from especially aggravated robbery to aggravated robbery. *Id.* at 50.

Zonge, 973 S.W.2d at 255.

Likewise, in State v. Barnes, 954 S.W.2d 760, 765 (Tenn. Crim. App. 1997), the court concluded that the victim who had received "several knots on the back of the head and bruises on the back . . ., a burn on the . . . nose from a light bulb, and a single bite on the arm" had not sustained "serious bodily injury." Additionally, a "broken nose and a bruised cheekbone" resulting in swelling, loss of teeth, five weeks missed from work, and "extreme physical pain over [the] whole face" did not support a claim of "serious bodily injury." State v. Sims, 909 S.W.2d 46, 48 (Tenn. Crim. App.), perm. app. denied (Tenn. 1995).

The testimony presented by the State was that the defendants beat the victims primarily by using a gun and by kicking Durham when he was on the ground. A photograph of Bell's injuries taken the day after the attack was entered as evidence and available to the jury. Dr. Robert Roth, attending physician at the emergency room at Summit Medical Center, testified as to the treatment each victim received. Dr. Roth testified that Bell's facial injuries were "disfiguring" and would require ongoing medical attention from plastic surgeons. Additionally, Bell suffered from swelling of the left testicle and soreness in his right hand, which he had used to fend off blows to his face. Dr. Roth also testified that the head wound Durham suffered was a significantly large, deep, blow-out type laceration of the skull, indicating significant force. He described the lacerations of Durham as being more "potentially dangerous" than those of Bell. Dr. Roth said that he prescribed pain medication for Durham because of the pain resulting from the "rather significant" blows to his head, and the abrasions to his "shoulder, elbow and knee were rather extensive and would be somewhat painful as the swelling persisted." Therefore, based upon the testimony, the evidence supports the

jury's findings that both victims suffered serious bodily injury.

## II. Lesser-Included Instructions

Based upon the evidence presented by the prosecution, the defendants have claimed that the trial court should have instructed the jury as to aggravated assault.

First, we will determine whether aggravated assault is a lesser-included offense of especially aggravated robbery with which the defendants were charged.

In State v. Dominy, 6 S.W.3d 472 (Tenn. 1999), our supreme court overruled State v. Trusty, 919 S.W.2d 305 (Tenn. 1996), to the extent that it had recognized "lesser grade" offenses as being distinct from lesser-included offenses and had allowed convictions for "lesser grade" offenses which were not lesser-included offenses under the statute for which the defendant was indicted. State v. Burns, 6 S.W.3d 453 (Tenn. 1999), a decision released the same day as Dominy, replaced the Trusty approach with an analysis which we will apply to this matter.

The following definition of "lesser-included" offenses was adopted in Burns, 6 S.W.3d at 466-67:

> An offense is a lesser-included offense if:
> (a)   all of its statutory elements are included within the statutory elements of the offense charged; or
>
> (b)   it fails to meet the definition in part (a) only in the respect that it contains a statutory element or elements establishing
>
> > (1)   a different mental state indicating a lesser kind of culpability; and/or
> >
> > (2)   a less serious harm or risk of harm to the same person, property or public interest; or
>
> (c)   it consists of
>
> > (1)   facilitation of the offense charged or of an offense that otherwise meets the definition of lesser-included offense in part (a) or (b); or
> >
> > (2)   an attempt to commit the offense charged or an offense that otherwise meets the definition of lesser-included offense in part (a) or (b); or
> >
> > (3)   solicitation to commit the offense charged or an offense that otherwise meets the definition of

lesser-included offense in part (a) or (b).

Section (a) of the <u>Burns</u> definition utilizes a statutory elements approach consistent with that set out in <u>Howard v. State</u>, 578 S.W.2d 83, 85 (Tenn.1979):[1]

> [A]n offense is necessarily included in another if the elements of the greater offense, as those elements are set forth in the indictment include but are not congruent with, all the elements of the lesser.

Applying the approach established in <u>Burns</u>, we conclude that aggravated assault is a lesser-included offense of especially aggravated robbery. The State has conceded that, under the <u>Howard</u> test, the elements of especially aggravated robbery, as set forth in the indictment, include the elements of aggravated assault.

At the conclusion of the trial in this case, the trial court instructed the jury only as to especially aggravated robbery, vandalism, and illegal possession of a firearm. At trial, defendant Carter had requested instruction on the lesser-included offense of aggravated assault; and the refusal of the trial court to do so was set out as an issue both in his motion for new trial and on appeal. In determining whether the trial court should have instructed as to the lesser-included offense of aggravated assault, we will apply the test set out in <u>Burns</u>:

> First, the trial court must determine whether any evidence exists that reasonable minds could accept as to the lesser-included offense. In making this determination, the trial court must view the evidence liberally in the light most favorable to the existence of the lesser-included offense without making any judgments on the credibility of such evidence. Second, the trial court must determine if the evidence, viewed in this light, is legally sufficient to support a conviction for the lesser-included offense.

<u>Burns</u>, 6 S.W.3d at 469.

Aggravated assault is defined at Tennessee Code Annotated § 39-13-102(a) (1997). That statute provides, in pertinent part, that a person commits aggravated assault who:

---

[1]The tests, however, may not be identical. Part (a) of the <u>Burns</u> test provides that an offense is lesser-included if "all of its statutory elements are included within the <u>statutory elements</u> of the offense charged[.]" <u>Burns</u>, 6 S.W.3d at 466. <u>Howard</u>, on the other hand, provides that an offense is "necessarily included in another if the elements of the greater offense, <u>as those elements are set forth in the indictment</u>, include, but are not congruent with, all the elements of the lesser." <u>Howard</u>, 578 S.W.2d at 85. While the difference is of no consequence to the facts of the present case, there may be cases in which the difference is material.

> (1) Intentionally or knowingly commits an assault as defined in
> § 39-13-101 and:
>
> (A) Causes serious bodily injury to another; or
>
> (B) Uses or displays a deadly weapon.

A person commits assault who:

> (1) Intentionally, knowingly or recklessly causes bodily injury
> to another;
>
> (2) Intentionally or knowingly causes another to reasonably
> fear imminent bodily injury; or
>
> (3) Intentionally or knowingly causes physical contact with
> another and a reasonable person would regard the contact as
> extremely offensive or provocative.

Tenn. Code. Ann. § 39-13-101(a).

During the trial in this matter, the victims testified that they were assaulted and robbed by the defendants. Only defendant Carter testified during the trial, and he denied that he had robbed the victims or even been at the Arby's parking lot that evening, where the victims testified that the robbery occurred. Thus, given this testimony, the only two possibilities are that the incident occurred as the victims testified, or it did not occur at all. Viewing this testimony in the "light most favorable to the existence of the lesser-included offense without making any judgments on the credibility of such evidence," Burns, 6 S.W.3d at 469, we conclude that no evidence was presented which reasonable minds could accept as to aggravated assault. Thus, we conclude that it was not error for the trial court not to instruct the jury as to the lesser-included offense of aggravated assault.[2]

However, considering the testimony and proof regarding the injuries to the victims in the light most favorable to the defendants, the evidence regarding the nature of their injuries mandated an instruction as to aggravated robbery. It was plain error for this instruction not to have been given and, accordingly, we reverse the convictions of both defendants as to especially aggravated robbery

---

[2]Although defendant Carter requested that the trial court instruct as to aggravated assault and raised the court's refusal to do so both in the motion for new trial and as an issue on appeal, Tucker did not so argue until his reply brief was filed with this court. He had neither requested this instruction in the trial nor raised as an issue the trial court's failure to instruct as to the lesser-included offense as an issue in the motion for new trial. Accordingly, as to Tucker, this issue was waived and cannot now be raised on appeal.

and remand for a new trial.  Tenn. R. Crim. P. 52(b).

### III.  Appropriateness of Sentences

Carter and Tucker argue that their effective sentences are excessive both as to their respective lengths and consecutive nature.  When a defendant challenges the length, range, or manner of service of a sentence, this court conducts a *de novo* review with a presumption that the determinations made by the trial court are correct.  See Tenn. Code Ann. § 40-35-401(d); see also State v. Anderson, 880 S.W.2d 720, 727 (Tenn. Crim. App. 1994).  That presumption is conditioned on an affirmative showing in the record that the trial court did in fact consider sentencing principles and all relevant facts and circumstances.  See State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991) (finding that the "presumption of correctness which accompanies the trial court's action is conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances").  The burden is on the defendant to show that the sentence is inappropriate.  See Tenn. Code Ann. § 40-35-401 Sentencing Commission Comments.  When our review supports a conclusion that the trial court imposed a lawful sentence, "then we may not disturb the sentence even if we would have preferred a different result."  State v. Fletcher, 805 S.W.2d 785, 789 (Tenn. Crim. App. 1991).

In sentencing the defendants, the court stated:

> All right.  The Court has studied these matters carefully.  And the Court finds in both cases I am going to amend the enhancement factors: I'll apply number one; I will apply number eight; I'll apply number nine; I'll apply number ten; and, I'll apply number thirteen, in both cases.  I find no mitigating factors.

> Under Section 39-15-402 [sic] on multiple convictions: I find that number two applies; I find that number four applies; and, I find that number six applies, with regard to both defendants.

> It appears to me, from what I heard, that Mr. Richard Tucker has been honest with the Court.  It appears to me, from what I heard that Mr. Jason Carter has not been honest with the Court.  The Court is going to take that into consideration in the sentencing.

> With regard to the sentencing in this case it is the judgment of the Court that, with regard to the Defendant Richard Tucker, Count One, he be sentenced to the Department of Corrections for a period of nineteen years as a range one standard offender at thirty percent-- excuse me--at eighty-five percent.  In Count Two he will be sentenced to the Department of Corrections for a period of nineteen years as a range one standard offender.  It will run at eighty-five percent.  Count

-13-

Three, he [will] be sentenced to the Department of Corrections for a period of two years as a range one standard offender at thirty percent. Count One and Count Two will run consecutive, one with the other. Count Three will run concurrent.

With regard to the Defendant Jason Carter it's the judgment of the Court, with regard to Count One, he be sentenced to the Department of Corrections for a period of twenty-two years. With regard to Count Two it's the judgment of the Court he be sentenced to the Department of Corrections for a period of twenty-two years. With regard to Count Three it's the judgment of the Court he be sentenced to the Department of Corrections for a period of three years. With regard to Count Four it's the judgment of the Court he be sentenced to the Department of Corrections for a period of two years. Count One and Count Two will run consecutive, one with the other. Count Three and Count Four will run concurrent. That's an effective forty-four year sentence at eighty-five percent.

With regard to Mr. Tucker, General, it is an effective thirty-eight year sentence at eighty-five percent.

That's the judgment of the Court.[3]

Both defendants were sentenced as standard offenders for a Class A felony, a status which provides a sentencing range of fifteen to twenty-five years. See Tenn. Code Ann. § 45-35-112(a)(1). "The presumptive sentence for a Class A felony shall be the midpoint of the range if there are no enhancement or mitigating factors." Id. § 40-35-210(c). If the trial court applies inappropriate factors, the sentence's presumption of correctness fails. See State v. Shelton, 854 S.W.2d 116, 123 (Tenn. Crim. App. 1992) (citing State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991)). In this case, the numbered sections were recited without detail as to how they were being applied to enhance the sentences and support consecutive sentences. Therefore, we review both the enhancement factors and the factors supporting consecutive sentences *de novo* on the record with no presumption of correctness.

## A. Length of Sentences

---

[3]The statements were not accurate regarding the "eighty-five percent." Tennessee Code Annotated § 40-35-501(i)(1)-(2) provides that a person committing especially aggravated robbery shall serve one hundred percent of the sentence imposed by the court. Credit authorized by § 41-21-236, or other provision of law, may reduce time served up to a maximum of fifteen percent. The credits under § 41-21-236 are not automatic but are earned by the inmate. Therefore, the accurate statement of the time to be served by defendants on Count One and Count Two is one hundred percent.

Tennessee Code Annotated § 40-35-114 provides for enhancement factors that the trial court may, if appropriate and if not themselves essential elements of the offense charged in the indictment, apply to increase the sentence within the applicable range for the offense. The trial court applied each of the following enhancement factors:

> (1)     The defendant has a previous history of criminal convictions or criminal behavior in addition to those necessary to establish the appropriate range;
>
> . . . .
>
> (8)     The defendant has a previous history of unwillingness to comply with the conditions of a sentence involving release in the community;
>
> (9)     The defendant possessed or employed a firearm, explosive device or other deadly weapon during the commission of the offense;
>
> (10)    The defendant had no hesitation about committing a crime when the risk to human life was high;
>
> . . . .
>
> (13)    The felony was committed while on any of the following forms of release status if such release is from a prior felony conviction:
>
>> (A)  Bail, if the defendant is ultimately convicted of such prior felony:
>>
>> (B)  Parole;
>>
>> (C)  Probation;
>>
>> (D)  Work release; or
>>
>> (E)  Any other type of release into the community under the direct or indirect supervision of the department of correction or local governmental authority[.]

Tenn. Code Ann. § 40-35-114.

As to factor (1), defendant Carter's presentence report revealed at least eight prior convictions on charges such as assault, malicious mischief, criminal trespassing, and indecent exposure. In 1993, he was convicted of both robbery and sexual battery and was sentenced to five years in the workhouse. As to factor (1), Tucker's presentence report revealed prior convictions on three counts of burglary, four counts of theft, including two counts of theft over $10,000, and numerous driving offenses. Thus, the record reflects the proper application of enhancement factor (1) as both defendants.

Factor (8) looks to the previous history of the defendant in the criminal justice system to determine how willing the defendant has been to comply with conditions of release into the community after conviction for an offense. All four of defendant Tucker's theft convictions in 1995 were served in the community corrections program. He was in that program at the time he committed a series of burglaries at a mini-storage facility. Defendant Carter had prior revocations of probation. We conclude the record reflects the proper application of enhancement factor (8) as to both defendants.

Use of a deadly weapon, the condition in factor (9), is an element of the offense. Factor (10) is also an element of the offense since "there is necessarily a high risk to human life and the great potential for bodily injury whenever a deadly weapon is used." State v. Nix, 922 S.W.2d 894, 903 (Tenn. Crim. App. 1995); see also State v. Hicks, 868 S.W.2d 729, 732 (Tenn. Crim. App. 1993) (finding that factor (10), absent any proof of risk to life other than the victim's, was an essential element of aggravated robbery). Therefore, we conclude that neither factor (9) nor (10) was properly applied to the defendants.

Defendant Carter was on probation for a prior felony, and therefore factor (13) clearly was applicable to him. See Tenn. Code Ann. § 40-35-114(13)(C). Defendant Tucker was on community corrections at the time of his conviction, which would be applicable under this factor as "[a]ny other type of release into the community under the direct or indirect supervision of the department of correction or local governmental authority." Id. § 40-35-114(13)(E). We conclude that factor (13) was appropriately applied to Tucker.

Thus, although the trial court erred in applying factors (9) and (10) to enhance the defendants' sentences, we find that the remaining factors justify the sentences imposed by the trial court. We note that defendant Tucker's sentence of nineteen years on each especially aggravated robbery count was less than the presumptive sentence of twenty years for a Class A felony and attribute this to the fact that the trial judge decided to consider the fact that Tucker told a truthful account of the events at the sentencing hearing. We, therefore, affirm the imposition of the sentences.

### B. Consecutive Nature of Sentences

Finally, the defendants argue that their sentences for especially aggravated robbery should not be served consecutively. According to the statute, the ordering of consecutive sentences is purely discretionary; nevertheless, the trial court must find by a preponderance of the evidence that at least

one of seven criteria is met. <u>See</u> <u>id</u>. § 40-35-115. The trial court applied the following criteria:

> (2) The defendant is an offender whose record of criminal activity is extensive;
>
> . . . .
>
> (4) The defendant is a dangerous offender whose behavior indicates little or no regard for human life, and no hesitation about committing a crime in which the risk to human life is high;
>
> . . . .
>
> (6) The defendant is sentenced for an offense committed while on probation[.]

Tenn. Code Ann. § 40-35-115(b).

Treating these in reverse order, we note first that the State conceded that criterion six applied only to defendant Carter and was erroneously applied by the trial court to defendant Tucker. We agree.

Criterion four has been specifically discussed by our supreme court. In <u>State v. Wilkerson</u>, 905 S.W.2d 933, 939 (Tenn. 1995), our supreme court held:

> [T]he imposition of consecutive sentences on an offender found to be a dangerous offender requires, in addition to the application of general principles of sentencing, the finding that an extended sentence is necessary to protect the public against further criminal conduct by the defendant and that the consecutive sentences must reasonably relate to the severity of the offenses committed.

This requirement of additional findings by the trial court has been recently limited to criterion four—"dangerous offenders." <u>See</u> <u>State v. Lane</u>, 3 S.W.3d 456, 461 (Tenn. 1999). The defendants' attack on the victims indicated little regard for human life. The beatings were violent. A loaded gun was pointed at one of the victims and was used to beat both victims. The taunt of defendant Carter to "just kill" one of the victims speaks to the lack of concern these defendants have for human life. Although there were no findings as to the <u>Wilkerson</u> criteria, we find that the record supports the conclusion that the defendants present a danger to the public as serious offenders who freely use drugs and loaded guns to support their use. The punishment meted out to the defendants is substantial, but it is also reasonably related to the severity of a crime where a gun is used and victims are severely beaten.

-17-

Defendant Tucker argues that criterion two is unconstitutionally vague in its use of the term "extensive" as a qualifier for a record of criminal activity. Challenges of vagueness must be examined in light of the complaining party's conduct and the facts of the case at hand. See Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc., 455 U.S. 489, 495, 102 S.Ct. 1186, 1191, 71 L.Ed.2d 362 (1982). A statute is not invalid simply because it may be arguably vague in a hypothetical instance but is clearly applicable to the complaining party. See id. Courts must indulge every presumption in favor of validity and resolve any doubt in favor of the constitutionality of a statute. See State v. Chavis, 617 S.W.2d 903, 905 (Tenn. Crim. App. 1980). The fact that a statute applies in a wide variety of situations and must necessarily use words of general meaning does not render it unconstitutionally vague. See State v. Lyons, 802 S.W.2d 590, 592 (Tenn. 1990). We find that the defendants' record of criminal activity was justifiably "extensive" and this criterion was met. We, therefore, affirm the trial court's imposition of consecutive sentences as to Tucker for the especially aggravated robbery convictions.

**CONCLUSION**

Based upon the foregoing, we reverse the convictions of Carter and Tucker for especially aggravated robbery and remand for new trials. In all other aspects, the judgments of the trial court are affirmed.