IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
January 23, 2001 Session

## STATE OF TENNESSEE v. WILLIAM MAKRANSKY

**Appeal from the Criminal Court for Bradley County**
**No. 98-479      Carroll L. Ross, Judge**

---

**No. E2000-00048-CCA-R3-CD**
**June 28, 2001**

---

The defendant, William Makransky, appeals his convictions for aggravated sexual battery, sexual battery, and two counts of contributing to the delinquency of a minor. He contends that he received the ineffective assistance of counsel at trial and that the trial court applied the incorrect standard for the prejudice prong in denying him relief on this issue in his motion for a new trial. Although we determine that the trial court did apply the incorrect standard for prejudice, our de novo review reveals that the defendant's trial attorney was not ineffective. Because of an error in the judgments, the sentences for contributing to the delinquency of a minor are modified.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed in Part and Modified in Part**

JOSEPH M. TIPTON, J., delivered the opinion of the court, in which GARY R. WADE, P.J., and JAMES CURWOOD WITT, JR., J., joined.

James F. Logan, Jr., Cleveland, Tennessee, for the appellant, William Makransky.

Paul G. Summers, Attorney General and Reporter; R. Stephen Jobe, Assistant Attorney General; Mark A. Fulks, Assistant Attorney General; Jerry N. Estes, District Attorney General; and Joseph V. Hoffer, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

The defendant, William Makransky, appeals his convictions by a jury in the Bradley County Criminal Court for aggravated sexual battery, a Class B felony; sexual battery, a Class E felony; and two counts of contributing to the delinquency of a child, a Class A misdemeanor. The trial court sentenced him to ten years as a violent offender for the aggravated sexual battery, two years as a standard offender for the sexual battery, and eleven months, twenty-nine days as a standard offender for both counts of contributing to the delinquency of a child. The court ordered the sentences for the misdemeanor convictions and the aggravated sexual battery conviction to be served concurrently with each other but consecutively to the sexual battery sentence. The defendant contends that the

trial court applied the incorrect standard in denying his ineffective assistance of counsel claim at the hearing on his motion for a new trial and that he received the ineffective assistance of counsel at trial. We affirm the convictions but modify the judgments of conviction for the two misdemeanors to conform with the transcript of the evidence, which reflects that the sentences are to be served concurrently with the aggravated sexual battery sentence. The judgments incorrectly reflect consecutive sentencing.

This case arises out of two events proven by the state: (1) an April 11 or 12, 1998 birthday party at which the defendant provided beer and drugs to his two underage foster children and following which he touched the vagina of the victim, his twelve-year-old neighbor, and (2) a May 10 or 11, 1998 incident during which the defendant touched the then thirteen-year-old victim's vagina in the swimming pool. At trial, two of the defendant's teenage foster children, Eric Pryzbyliski and Shannon Randolph, testified that on April 11 or 12, 1998, the defendant gave them beer and suggested that they drug the victim and then perform sexual acts with her.

The victim testified that on April 11 or 12, 1998, when she was twelve years old, the defendant asked her to babysit the younger foster children. She said that later that evening, the defendant gave her two hundred dollars and said she was pretty. She said that he told Butch Lenahan and Shannon Randolph to go downstairs and then he pulled her feet onto his lap. She stated that he began rubbing her leg on her thigh and then he rubbed her vagina inside her shorts. She said that she told the defendant to stop and that he began sucking her toes, which she also told him to stop. She said that Mr. Lenahan returned, the defendant and Mr. Lenahan began fighting, and she ran home. She said that on May 10 or 11, following her thirteenth birthday on May 3, 1998, she was in the defendant's pool when the defendant pulled her onto his lap and rubbed her vagina outside of her clothing. She said that John Russell, who was also in the pool, was not looking when the defendant did this. She said that she did not tell her mother or the defendant's wife about these incidents until the following September because she was afraid of the defendant.

Butch Lenahan, a boarder in the defendant's home, testified as follows: On the evening of April 11,1998, the defendant, who was sitting on a couch with the victim, ordered him and Shannon Randolph to turn out the lights and to go downstairs. Not feeling right about the situation, he went back upstairs and overheard the defendant telling the victim how beautiful she was, that others did not appreciate her, and that he had already given her one hundred dollars and wondered how much more she wanted. He went to the bathroom and then returned and asked to speak to the defendant privately. Although Mr. Lenahan saw no sexual touching, the defendant was rubbing the victim's legs, which were on his lap. After refusing to speak with him several times, the defendant got up and began to fight with him. He subsequently left and called the police from a pay telephone.

The defendant's mother, Elizabeth Makransky, and her friend, Cecilia Sanders, testified for the defendant that they had visited him from May 3-15, 1998, to care for him because he was ill and that the Makranskys' swimming pool was closed during their visit. Eighteen-year-old John Russell testified that the defendant's pool opened around Memorial Day at the end of May 1998. Following the trial and his subsequent convictions, the defendant hired new counsel to represent him at

sentencing, at the hearing on his motion for a new trial, and on appeal. He challenges the effectiveness of his trial attorney.

At the hearing on the motion for a new trial, the defendant testified that his first meeting with his trial attorney occurred after he had already consulted another attorney about his case but was dissatisfied with him because the attorney did not contact him within a couple of days. He said that he decided to hire his trial attorney to represent him because the trial attorney told him that he was going to talk with Detective Alvarez about the status of the defendant's case in order to determine if he really needed an attorney. He said that he told his attorney that he had never had a sexual relationship with the victim.

The defendant testified that he told his attorney about his health condition from 1994 to that time. He said that in 1994, he had weighed five hundred pounds but that at the time of trial, he weighed around four hundred pounds. He said that he showed his attorney copies of his medical records from Dr. Newton, relating to the time period of the 1998 events. He said that he told his attorney that he had been in the hospital and received treatment in February 1998 but that the local hospital could not diagnose his problem. He said that he told his attorney that he had called his former doctor in New York, who referred him to Mount Sinai Hospital in New York for further testing. He said that he gave his attorney medical records revealing that he was incapacitated on May 14, 1998, and medical records from his visit to a urologist on May 18th, showing that he was incapacitated two weeks earlier. He said that he also told his attorney that he went to Cleveland Community Hospital on June 4, 1998, for a pain evaluation. He said that he did not know that his medical records had been subpoenaed, nor did he know why his attorney did not present his prostatitis and other health conditions to the jury. He said that he had a reoccurring prostate inflamation and back problems and that he was in constant pain. He stated that with these problems, he had no desire to have sex.

The defendant testified that his attorney never asked him if he had gone anywhere during the time that his mother was caring for him while he was sick. He said that he accompanied his mother to his attorney's office and that his attorney did not ask her if she had left his house during her stay. He said that he contacted John Russell and brought him to the attorney's office on the day of trial. He said that his attorney said that he felt confident about the case and that anyone could see what his wife and the others were trying to do. He said that his attorney made him feel confident about the case.

The defendant testified that three or four days before trial, he talked to his attorney about whether he would take the stand. He said that he did not testify at the trial because his attorney advised him not to, saying that it would open a "can of worms." He agreed that the expression "to open a can of worms" meant that something bad would happen. He said that his attorney gave four reasons why he should not testify. He said that the first reason related to a photograph developed by the defendant's wife after they had separated. He stated that the photograph showed him standing near seventeen-year-old John Russell, who was asleep on a couch. He said that in the photograph, he was holding a wooden penis to his groin area with the other end near Mr. Russell's mouth. He

agreed that people might disapprove of the photograph of him and Mr. Russell. He said that his attorney talked to him about the statement he gave to Detective Alvarez, in which the detective asked him if he had ever done anything sexually inappropriate with a child.

The defendant testified that his attorney also advised him not to testify because the attorney was afraid that he would be asked about the allegations of intercourse with the victim. He thought that his attorney had learned of these allegations because they were initially included in the indictment. He said that he did not think that these allegations would have presented a problem if he had been able to tell his side of the story. He said the third reason that his attorney advised him not to testify was because he had taken a weapon to a neighbor's house to show it to the neighbor. He said the only explanation that the attorney gave regarding this reason was that he did not want to open a can of worms. He said the fourth reason was because of a letter he had written to his wife. The state presented the letter to the trial court, and it was included as an exhibit on appeal. In the letter, the defendant refers to his drug and alcohol use and states that he has a "compulsion or needs that aren't getting met, in some sick way." He said that he and his attorney quickly dismissed this reason because he had written the letter after the time that the offenses were alleged to have occurred. He said that his attorney felt confident with the other evidence he had to present and thought that the jury would learn "everything" if the defendant testified. He said that after hearing the witnesses at trial, he told his attorney that he wanted to testify but that his attorney became annoyed with him and said that it would open a can of worms.

The defendant testified that his attorney never went over his Department of Children's Services (DCS) file with him. He said that he did not authorize the state to get his DCS file. He stated that the DCS worker who testified as a rebuttal witness for the state had been in the courtroom for the entire trial. He agreed that he went to the seminar in Dayton, Tennessee, that was the subject of the DCS worker's testimony.

Elizabeth Makransky, the defendant's mother, testified as follows: She and her friend, Cecilia Sanders, testified at the defendant's trial. She met with the defendant's trial attorney twice, once two days before trial and once on the morning of trial. The defendant and Ms. Sanders were also present at the first meeting, which lasted about one-half hour. The attorney spent part of the time chatting with Ms. Sanders about her background, leaving only twenty minutes to discuss the case. The attorney mainly discussed with her the fact that the defendant's pool was closed when she visited the defendant from May 3 to 15, 1998. The attorney told her to make eye contact only with him and to keep her answers brief, to "yes" or "no." At the time of the alleged offenses, the defendant was receiving treatment for continuing prostate and back problems, which caused him pain. The attorney never discussed the defendant's health with her, and when the defendant mentioned his health and asked if the attorney should have the defendant's medical records, the attorney said it was not important. When she asked the attorney questions, he became annoyed and rolled his eyes. The attorney was very confident about the case. He never mentioned DCS documents or a certification process to her.

Mrs. Makransky testified that she also met with the attorney thirty minutes before the trial began and that the defendant, Ms. Sanders, John Russell, and Ricky Lloyd were present. She said they did not discuss her testimony at that meeting. She had never been in a courtroom before the defendant's trial, the attorney did not explain cross-examination to her, and she did not know that she would be questioned by the state. She admitted that she had watched courtroom scenes on television and in movies but that she did not realize it was non-fiction when the witnesses were cross-examined. She was discredited during her trial testimony regarding whether the defendant had left the house during her May 1998 visit, although she had testified that the defendant could get up and down. She did not know if the defendant left the house during her visit. At trial, the defendant's attorney did not ask if she had ever left the house during her visit, and she had left at times to go grocery shopping.

Mike Caputo, an attorney, testified as follows: He is licensed in Tennessee and spent four years in the Judge Advocate General Corps, prosecuting and defending cases. He was an Assistant District Attorney for ten years, two of which he spent in Bradley County, prosecuting over sixty child sex abuse cases. He had been in private practice since 1988 and was familiar with the standard of practice and range of competence of attorneys in Bradley County. He had reviewed the transcript of the defendant's trial but had not discussed the case with the defendant or his present attorney. Based upon his experience and background, he formed some opinions regarding the trial attorney's performance. He acknowledged that the mere fact that the client is convicted does not mean that the attorney was ineffective.

Mr. Caputo testified that in addition to the attorney's duty to investigate the case, he believed that it was important to develop a theory to use in the opening statement, during the cross-examination of witnesses, and again in closing argument. In defending sex abuse cases, it is important to find some motivation for the complainant to be making the allegations against the defendant. Here, the defense needed to form a theory regarding the young men who testified against the defendant, as well as the victim. He did not believe that the defendant's trial attorney developed a theory or alternate theories of defense. For the April 1998 incident, the trial attorney seemed to be asking the jury not to believe the victim, Butch Lenahan, or Shannon Randolph without giving any reasons. For the second incident, the trial attorney relied upon the fact that the pool was closed. Mr. Caputo thought that the trial attorney could have developed a theme regarding the victim's relationship with Shannon Randolph and the possibility that the defendant, being a foster parent, would want to end that relationship.

Mr. Caputo testified that the defendant's medical records were significant because they showed that the defendant was physically incapacitated. The trial attorney would not have had to show that the defendant was incapacitated on the days in question. By showing that the defendant had prostate problems over a long period of time, the attorney would have allowed the jury to consider lack of desire and the fact that the young witnesses would not have recognized the consequences of prostate problems. This would have provided a medical reason for the jury to have reasonable doubt. The trial attorney should have called Dr. Robert Sendele to show that the defendant could not walk over one hundred feet in May 1998. On cross-examination, Mr. Caputo

agreed that sexual battery could be committed with the hands and that the ability to do that had nothing to do with the condition of the perpetrator's prostate gland. He recalled the testimony that the defendant ripped out a counter and testimony at the sentencing hearing that the defendant lifted a lawnmower.

Mr. Caputo testified that evidence of air temperatures relative to use of the defendant's pool would have been important. From his experience with his own pool, he noted that it was too cold to use an unheated pool during May. Evidence from the National Weather Service that during May 1 to 15, 1998, the temperature rose to a high of sixty-four degrees on only three or four days would have been relevant and important to the defense. He agreed that this evidence would have shown that the events regarding the pool incident did not happen. He could think of no reason why a competent attorney would not investigate the temperatures.

Mr. Caputo testified that it was good trial strategy for the trial attorney to discuss with the defendant whether he would testify. He agreed that the photograph of the defendant and John Russell would have been very inflammatory to a Bradley County jury. He admitted that an attorney would not want to open the door to the admission of the rape allegations that had been no-billed by the grand jury, but he strongly doubted that the state could go into those. He agreed that it was good trial strategy to keep the jury from learning of a letter in which one's client admitted to being sick and using drugs. He also acknowledged that it was sound trial strategy to prevent the jury from hearing about one's client taking a weapon to someone's house, placing the weapon to a person's head, repeatedly pulling the trigger, and threatening to kill people.

Mr. Caputo testified that the trial attorney failed to rehabilitate Mrs. Makransky and Ms. Sanders when the state attempted to introduce a certificate showing that the defendant had participated in a seminar in Dayton, Tennessee. Mr. Caputo acknowledged that the state had a right to hold this evidence back in rebuttal. Even though the trial attorney was surprised by this evidence, he could have rehabilitated the witnesses by asking them if they had ever left the defendant's house during their visit. His failure to rehabilitate these witnesses was ineffective representation in this case.

Mr. Caputo testified that before the trial attorney cross-examined Cynthia Ramsey, the victim's mother, the only testimony regarding the May 1998 incident in the pool was that of the victim. The trial attorney essentially corroborated the victim's testimony by asking Ms. Ramsey if the victim had told her about the pool incident. Thus, the trial attorney helped prove part of the state's case. Mr. Caputo admitted that it was good trial strategy for the attorney to ask the young people if the pool was opened in May 1998, knowing that he had a witness who would testify that it was closed. Although this was basically a good trial strategy, Ms. Ramsey had testified without saying that the victim had told her about the May 1998 event. The trial attorney's cross-examination allowed Ms. Ramsey to corroborate the victim's testimony on the May event.

Mr. Caputo testified that in the closing argument, the trial attorney failed "to give the jury anything to hang their hat on." Although he argued that the witnesses were trying "to jam[b] up" the

defendant, the trial attorney did not point out that the victim did not call for help during the alleged sexual battery in April 1998 although she knew people were downstairs. The trial attorney did not argue about the motivations of the young people to accuse the defendant and gave no reason for the jury to disbelieve the victim, except for his argument that the pool was closed at the time of the May 1998 incident.

The defendant's trial attorney testified that he had practiced law since April 1987. He said that the defendant consulted him in the fall of 1998 about speaking with Detective Alvarez regarding sexual allegations against the defendant. He said that the defendant told him that the case was in the beginning stages and that he wanted some information about the case. He said that when he spoke to Detective Alvarez, he learned that the defendant had given a statement and was asked to submit to a polygraph test. He said that Detective Alvarez told him that when the defendant did not come for the polygraph test, the detective took the case to the grand jury. The attorney said that he represented the defendant on an order of protection before the grand jury indicted the defendant in the present case. He said that at that time, he cross-examined the defendant's wife, who was seeking the order of protection and alimony, and that she testified that the defendant had molested some of his foster children. He said that the defendant had told him only about the allegations regarding the victim that occurred at a barbeque, which involved beer.

The attorney testified that he got a copy of the state's entire file. He said that the records of the DHS investigation of the allegations were in the state's file. He said that he reviewed the portions of the defendant's DHS and DCS files that were in the state's file but did not review the original DHS or DCS files. He said that he hired a private investigator to interview witnesses. He said that Butch Lenahan refused to speak with the investigator. He did not recall being unable to locate any witnesses requested by the defendant. He said that the defendant gave him the names of witnesses whom the defendant claimed knew everything about the case but that when the witnesses were interviewed, they would have no factual knowledge of the events. He said that the defendant believed that the grandmother of one of his foster children would be a helpful witness but that the interview of the grandmother revealed that she believed the defendant had molested her grandson.

The attorney testified that the defendant asked him to investigate his medical condition. He said he subpoenaed Dr. Newton's records, but they contained nothing that had any bearing upon the defendant's case. He said he also subpoenaed the records of a urologist in Chattanooga. He stated that both Dr. Newton and the urologist had examined the defendant only one or two times, but the defendant had led him to believe that these doctors had seen him numerous times, diagnosed his condition, and ordered that he be on bed rest. He said that although the records revealed that the defendant had an inflamation of the urinary tract, they did not give any details that he believed could be used at trial. He said nothing in the defendant's medical records suggested that he was confined to bed. He said he believed he showed the severity of the defendant's medical condition through the testimony of the defendant's mother and her friend. On cross-examination, he acknowledged that he did not look at all of the defendant's medical records that he had subpoenaed but said that he had reviewed Dr. Newton's and the urologist's office notes. He agreed that no reason existed not to introduce the medical records.

The attorney testified that the defendant told him that his mother and another woman could testify about the defendant's inability to get out of bed or to play with the children. He said that a week before trial, he talked for one and one-half hours with the defendant, his mother, and her friend about the mother's and friend's testimony. He said that he believed that the defendant's mother and her friend would testify that they came to care for the defendant because he was seriously ill, that he could not get out of bed or play with the children, that the defendant's wife was also sick, and that the pool was closed during their visit. He said that he tried to gather facts and to tell them about where he was going with the case and what he wanted to do. He said he thought he had answered all of the questions asked by the defendant's mother and that he had explained the separate incidents involving the beer party and the pool. He said that he could not think of much about which the state would cross-examine the defendant's mother and that he was mainly concerned with confirming the dates of her visit.

The attorney testified that before trial, the defendant asked a lot of questions because he was nervous about the charges. He said that he tried to explain to the defendant the status of the case and what he was trying to do. He said the defendant harbored a lot of animosity toward his wife and always wanted to discuss his wife's actions. He said that he tried to return the focus of their discussions to the victim and that he told the defendant that they could use his wife indirectly. He said that he did not want the defendant to testify in part because he feared that the defendant would not be truthful during cross-examination but that he was mainly concerned about the defendant opening the door to evidence on the rape allegations. He said he was concerned about the introduction of the photograph depicting the defendant holding a gourd shaped like a penis near the mouth of a boy. He said that the photograph was the subject of one of the charged offenses, which was severed and later dismissed. He said that he did not know if a letter of apology that the defendant had written to his wife could be admitted if the defendant testified. He said that he was concerned that the state would attempt to retry the entire case through its cross-examination of the defendant. He said that after discussing with the defendant the reasons for not testifying, he believed that the defendant understood. He said that following this discussion, the defendant agreed not to testify and said, "Whatever you think."

The attorney testified that before trial, he filed a Rule 412, Tenn. R. Evid., motion relating to the allegations that the defendant had raped the victim in order to prevent being precluded from using those allegations at trial. He said that at that time, he was not sure how he was going to use the allegations. He said that he decided not to proceed with the motion before trial because he did not believe that he needed to use those allegations. He said that he would not have tried to show that the defendant was guilty of these allegations. He stated that he knew Shannon Randolph was the victim's boyfriend and that Mr. Randolph and the victim had admitted to a DHS worker that they had engaged in sexual intercourse. He said that he did not introduce evidence of their relationship because he thought that it would probably result in the admission of other evidence that he was trying to keep from the jury. He said that he did not believe it likely that the sexual relationship between the victim and Mr. Randolph could be admitted under Rule 412.

Regarding his trial strategy, the attorney testified that he did not think that he could do much with regard to the beer party, except admit that it occurred and that the defendant and the others were intoxicated. He said that he attempted to emphasize the length of time between the party and the victim making a statement alleging that the defendant had molested her and to keep the allegations of rape from the jury. He said that he intended to raise reasonable doubt by showing that the police and a DHS worker investigated the April 1998 incident and did not charge the defendant with anything. He said that he tried to show that the state's witnesses were plotting against the defendant. He said that he planned to show that the victim did not make her allegations against the defendant until she had conversations with the defendant's wife and that the defendant and his wife were separated. He said that he did not think that Ms. Ramsey or the children knew that the pool was not open at the time of the alleged May incident. He said that he tried to get Ms. Ramsey and the children to say that the pool was opened, to present competent proof that the pool was closed, and then to argue about this in his closing argument in order to build reasonable doubt.

The attorney agreed that evidence that the temperature on May 3, 1998, was forty-five to sixty-three degrees would be compelling evidence that people were not swimming on that day. He said that when the defendant suggested that he check the newspaper records regarding the temperature on the days in question, he declined because it was close to trial, and he believed that the proof from the defendant's mother, her friend, and Mr. Russell would be sufficient. He admitted that the temperature evidence could have been critical or decisive in the defendant's case.

The attorney testified that he was shocked when the state introduced in rebuttal a certificate of the defendant's participation in a conference on foster care and adoption in Dayton, Tennessee, on May 6, 1998. He said that he did not recall the state trying to introduce the certificate during the testimony of the defendant's mother. He said that if he looked at the certificate during her testimony, he did not realize that it proved that the defendant had been anywhere. He said that he did not realize its significance until the state introduced it on rebuttal and that, therefore, he did not attempt to rehabilitate the defendant's mother or her friend. On cross-examination, he agreed that failing to take the time to understand the certificate when the state sought to introduce it through Mrs. Makransky was significant.

The trial court found that although trial counsel might have done some things differently, the defendant did not receive the ineffective assistance of counsel based upon the prejudice prong of the two-part standard. The court clarified that it was not making a finding one way or the other regarding the deficiency prong and denied the defendant's motion for a new trial.

## I. STANDARD FOR THE INEFFECTIVE ASSISTANCE OF COUNSEL

The defendant contends that the trial court applied the incorrect standard in ruling upon his ineffective assistance of counsel claim at the hearing on the motion for a new trial. He argues that the trial court required him to show that there would have been a different result if his trial attorney had not been ineffective. He maintains that, instead, he had to prove only the existence of a reasonable probability that the effect of his trial counsel's deficient performance was sufficient to

undermine confidence in the outcome of the trial. The state argues that the trial court applied the correct standard regarding prejudice to the defendant.

Ineffective assistance of counsel claims can be raised on direct appeal, and we apply the same standard used for such claims in post-conviction proceedings. See State v. Burns, 6 S.W.3d 453, 461 n.5 (Tenn. 1999). When a claim of ineffective assistance of counsel is made under the Sixth Amendment, the burden is upon the complaining party to show (1) that counsel's performance was deficient and (2) that the deficiency was prejudicial in terms of rendering a reasonable probability that the result of the trial was unreliable or the proceedings fundamentally unfair. Strickland v. Washington, 466 U.S. 668, 687, 104 S. Ct. 2052, 2064 (1984); see Lockhart v. Fretwell, 506 U.S. 364, 368-72, 113 S. Ct. 838, 842-44 (1993). The Strickland standard has been applied to the right to counsel under Article I, Section 9 of the Tennessee Constitution. State v. Melson, 772 S.W.2d 417, 419 n.2 (Tenn. 1989).

In Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn. 1975), our supreme court ruled that attorneys should be held to the general standard of whether the services rendered were within the range of competence demanded of attorneys in criminal cases. The court stated that the range of competence was to be measured by the duties and criteria set forth in Beasley v. United States, 491 F.2d 687, 696 (6th Cir. 1974), and United States v. DeCoster, 487 F.2d 1197, 1202-04 (D.C. Cir. 1973). Also, in reviewing counsel's conduct, a "fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." Strickland, 466 U.S. at 689, 104 S. Ct. at 2065; see Hellard v. State, 629 S.W.2d 4, 9 (Tenn. 1982).

The approach to the issue of the ineffective assistance of counsel does not have to start with an analysis of an attorney's conduct. If prejudice is not shown, we need not seek to determine the validity of the allegations about deficient performance. Strickland, 466 U.S. at 697, 104 S. Ct. at 2069. In order to establish prejudice, the defendant must show that a reasonable probability exists that "'but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.'" Burns, 6 S.W.3d at 463 (quoting Strickland, 466 U.S. at 694, 104 S. Ct. at 2068) (citations omitted).

The defendant has the burden of proving by clear and convincing evidence the factual allegations that would entitle him to relief. See Burns, 6 S.W.3d at 461 n.5; see also Tenn. Code Ann. § 40-30-210(f). On appeal,

> a trial court's findings of fact underlying a claim of ineffective assistance of counsel are reviewed . . . under a de novo standard, accompanied with a presumption that those findings are correct unless the preponderance of the evidence is otherwise. However, a trial court's conclusions of law–such as whether counsel's performance was deficient or whether that deficiency was prejudicial–are reviewed under a purely de novo standard, with no presumption of correctness given to the trial court's conclusions.

Fields v. State, 40 S.W.3d 450, 458 (Tenn. 2001) (citations omitted) (emphasis in original); see also Burns, 6 S.W.3d at 461 (holding that appellate review of the trial court's conclusion regarding the effectiveness of counsel is de novo because it involves a mixed question of law and fact).

In the present case, the trial court initially gave the correct standard for the prejudice prong, stating that the defendant had to prove that he was prejudiced by any deficiency by showing a reasonable probability that the results of the trial were unreliable or that the trial was fundamentally unfair. However, the court continued its analysis by stating: "And the Court cannot say, number one, that the trial would have been different if, in fact, counsel had, for instance, shown that the average temperature that day or the low was 46 degrees or something of that nature." After the court had denied the motion for a new trial based upon the prejudice prong, defense counsel attempted to clarify the ruling:

> [Defense Counsel]: . . . . As I understand the Court's ruling – I want to make certain – the Court is not making a finding with reference to the first test, but is – the first tier. As I pointed out to the Court, the two-tiered test that your Honor's pointing to, but is making a finding that your Honor cannot say that there would have been a different result under the second tier, and thus cannot say that there was ineffective assistance of counsel.
>
> The Court: That's correct. I'm not making a finding one way or the other on the first tier.
>
> [Defense Counsel]: That's what I understood.

The defendant filed a notice of appeal to this court, but the trial court had yet to enter a written order denying the motion for a new trial. This court stayed the appeal until the trial court entered an order on the new trial motion. In that order, the trial court overruled the defendant's motion, stating that it did "not make a finding one way or the other on the first tier of the ineffective assistance of counsel claim; however, the Court cannot say that there would have been a different result under the second tier, and thus cannot say that there was ineffective assistance of counsel."

The state argues that the trial court's comment that the temperature evidence would not have altered the results at trial does not reasonably indicate that the court applied the wrong standard in light of the court's relating the correct standard prior to this comment and its record of applying the correct standard for the prejudice prong in other cases. See, e.g., Jackie William Crowe v. State, No. E1998-00016-CCA-R3-PC, McMinn County (Tenn. Crim. App. June 20, 2000), app. denied (Tenn. Jan. 8, 2001); Greg L. Baine v. State, No. 03C01-9806-CR-00201, Polk County (Tenn. Crim. App. May 11, 1999), app. denied (Tenn. Oct. 11, 1999); Larry Kelley v. State, No. 03C01-9802-CC-00049, Bradley County (Tenn. Crim. App. Nov. 3, 1998), app. denied (Tenn. Mar. 22, 1999). Although we agree that the trial court initially cited the correct standard for the prejudice prong, we cannot assume in light of the subsequent statements and the written order that it applied the correct

standard. In <u>Lockhart v. Fretwell</u>, the United States Supreme Court emphasized the difference between the prejudice prong of <u>Strickland</u> and a finding that the outcome would have been different:

> Under our decisions, a criminal defendant alleging prejudice must show "that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." Thus, an analysis focusing solely on mere outcome determination, without attention to whether the result of the proceeding was fundamentally unfair or reliable, is defective.

506 U.S. at 369-70, 113 S. Ct. at 842-43 (quoting <u>Strickland</u>, 466 U.S. at 687, 104 S. Ct. at 2064) (citations and footnote omitted). "The touchstone of an ineffective-assistance claim is the fairness of the adversary proceeding . . . ." <u>Id.</u> at 370, 113 S. Ct. at 843. With this standard in mind, we re-examine the prejudice prong in this case.

## II. INEFFECTIVE ASSISTANCE OF COUNSEL

The defendant contends that he received the ineffective assistance of counsel at trial. He claims that he was prejudiced by his trial attorney's failure to present evidence of the air temperatures in May 1998 and of his medical condition at the times of the alleged offenses. The state contends that the defendant has failed to prove that he was prejudiced by the allegations of deficiency.

As discussed above, in order to prove that he or she received the ineffective assistance of counsel, a defendant must show that his or her attorney's performance fell below the level of competence required of attorneys in criminal cases. <u>Baxter</u>, 523 S.W.2d at 936. The defendant must also prove a reasonable probability exists that in the absence of the attorney's mistakes, the trial would have been different. <u>Burns</u>, 6 S.W.3d at 463. The court may look first to whether the defendant has suffered prejudice and, finding none, does not have to determine whether counsel was deficient. <u>Strickland</u>, 466 U.S. at 697, 104 S. Ct. at 2069.

In the present case, the defendant contends that at the hearing on the motion for a new trial, the trial court was unable to find that his trial attorney's performance was within the range of competence demanded of attorneys in criminal cases. To the contrary, the trial court explicitly stated at the hearing and in its order denying the motion for a new trial that it had decided the issue on the prejudice prong and that it was not making a finding regarding the deficiency prong. We note that in a claim of ineffective assistance of counsel, "questions concerning the credibility of the witnesses, the weight and value to be given their testimony, and the factual issues raised by the evidence are to be resolved by the trial judge." <u>Fields</u>, 40 S.W.3d at 456. The legislative purpose behind requiring the trial court to make written findings of fact and conclusions of law in the post-conviction setting is "to facilitate appellate review of the lower court's proceedings." <u>State v. Swanson</u>, 680 S.W.2d 487, 489 (Tenn. Crim. App. 1984) (analyzing the requirement under the former Post-Conviction Procedure Act that the trial court enter a written order containing findings of fact and conclusions of law for each ground that the petitioner presents); <u>see</u> Tenn. Code Ann. §

40-30-211(b) (requiring the trial court to enter a final order, stating its factual findings and legal conclusions with regard to each ground for post-conviction relief); see also Burns, 6 S.W.2d at 461 n.5 (requiring the same burden for the defendant to prove factual allegations of ineffective assistance of counsel on direct appeal as required in the appeal of a post-conviction proceeding). Because the facts surrounding the defendant's allegations are not in dispute, there is no need to remand the case to the trial court for further findings. As noted above, our review of the legal issues of whether the defendant's trial attorney was deficient and whether the defendant suffered prejudice from any deficiency is de novo. Fields, 40 S.W.3d at 458.

The defendant contends that although his trial attorney relied upon the fact that the pool was closed during the time of the May incident as the sole theory of defense, he failed to secure and present indisputable evidence of the temperature on the days in question, which would have corroborated the fact that the defendant's pool was closed. He summarily claims that he was prejudiced by the attorney's failure to introduce the temperature evidence in order to prove that the pool was closed and people were not swimming. The state contends that the defendant has failed to prove that he was prejudiced by his attorney's failure to present the temperature data because the high and low temperatures do not reveal that it was too cold to use the pool in May 1998. It also argues that the defendant's medical records for May 14, 1998, reveal that the defendant reported participating in pool exercises seven days per week.

The defendant's expert attorney, Mike Caputo, testified that evidence of the temperatures in May as they related to use of the defendant's pool would have been important and relevant to the defense. He believed that this evidence would have shown that the events regarding the pool incident on May 10 or 11 did not happen. The defendant's trial attorney testified that when the defendant suggested that he check the newspaper records regarding the temperature on the days in question, he declined because it was close to trial and he believed that testimony that the pool was closed from the defendant's mother, her friend, and a teenage boy would be sufficient. He acknowledged that evidence that the temperature on May 3, 1998, was forty-five to sixty-three degrees would be compelling evidence that people were not swimming on that day. He admitted that the temperature evidence could have been critical or decisive in the defendant's case.

At trial, the victim initially testified that she was in the pool with the defendant around May 7, 1998, but after reviewing her statement to Detective Alvarez, she recalled that she was in the pool with the defendant on May 10 or 11, 1998. She stated that the defendant pulled her onto his lap and began rubbing her vagina over her clothing. Defense witnesses, Elizabeth Makransky and Cecilia Sanders, testified that the defendant's pool was not opened from May 3 through 15, 1998. Defense witness, John Russell, testified that the defendant's pool did not open until Memorial Day in 1998. According to the temperature charts introduced by the defendant, the temperature on May 7, 1998, reached a high of 84.2 degrees Fahrenheit and a low of 60.8 degrees Fahrenheit. The temperature on May 10, 1998, ranged from 77 to 57 degrees Fahrenheit. The temperature on May 11, 1998, reached a high of 80.6 degrees Fahrenheit and a low 57.2 degrees Fahrenheit. We agree with the state that the trial attorney's failure to present this evidence at trial did not prejudice the defendant.

The defendant contends that his attorney was ineffective for failing to produce readily available medical evidence that would have refuted the testimony of the state's witnesses. He argues that he was prejudiced by his attorney's failure to produce his medical records because these records show that it was unlikely that he committed the sexual batteries because of his medical condition. He maintains that Mr. Caputo testified that this evidence would have given the jury reasonable doubt about his guilt. He contends that the medical records were readily available and that the trial attorney had no reason for failing to introduce them. He concludes that because the medical records would have provided the jury reasonable doubt regarding his guilt, it is probable that, but for his attorney's failure to introduce these records, the result of the trial could have been different.

The state contends that although the defendant's medical records demonstrate a host of medical problems, including back pain and prostatitis, they fail to establish his lack of interest in sex. It points to the records from May 14, 1998, in which the defendant reported that although he had been able to achieve an erection, he was unable to achieve orgasm. Furthermore, it argues that, as acknowledged by the defendant's expert attorney, none of the defendant's medical problems prevented him from using his hands.

At the hearing on the motion for a new trial, the defendant testified that due to his reoccurring prostate inflamation and the pain from his back problems, he had no desire to have sex. The trial attorney testified that the defendant asked him to investigate his medical condition. He said he subpoenaed the defendant's medical records from Dr. Newton and a urologist in Chattanooga, but nothing in these medical records suggested that he was confined to bed. He said that he believed that he showed the severity of the defendant's medical condition through the testimony of Mrs. Makransky and Ms. Sanders. On cross-examination, he agreed that no reason existed not to introduce the medical records.

After reviewing the medical records introduced by the defendant at the motion for a new trial, we agree with the state that the defendant was not prejudiced by his attorney's failure to present these records. The defendant's medical records from Dr. Robert Sendele on May 14, 1998, reveal that the defendant reported a "new history of inability to have orgasm although erection is intact." The defendant reported performing pool exercises seven days per week, and the doctor noted that he reviewed exercises with the defendant at length. The defendant's records from his May 18, 1998 visit to Dr. Nicholas Newton state that the defendant's chief complaint was difficulty urinating. The record notes that the defendant had been unable to ejaculate since taking Prozac. Dr. Newton diagnosed the defendant as having benign prostatic hypertrophy and prostatitis. The defendant's medical records from a June 4, 1998 pain evaluation at Cleveland Community Hospital relate that he reported experiencing lower back pain since a work-related accident in July 1991 and that his pain prevented him from having a sexual relationship. These medical records prove neither a lack of sexual desire nor that the defendant was confined to bed in early May. In fact, despite the trial attorney's admission that no reason existed not to introduce the medical records, the defendant's report on May 14, 1998, that he had been engaging in pool exercises seven days per week contradicted the defense theory that the pool was closed at the time of the May offense.

Finally, the defendant summarily lists numerous other general allegations regarding how his counsel was ineffective without providing this court the benefit of argument or citations to the record on these purported "acknowledged facts and conclusions." He claims that his trial attorney:

(1) provided ineffective and inadequate investigation of the issues;

(2) failed to review his DHS and DCS files as they relate to his actions and those of his wife and the children who testified against him;

(3) prepared a Rule 412, Tenn. R. Evid., motion purporting to acknowledge sexual activity between the defendant and the alleged victim when the same had not occurred and there was absolutely no evidence of the same;

(4) failed to file a Rule 412, Tenn. R. Evid., motion or present evidence regarding the sexual activity between the victim and a witness, which would have revealed the witnesses' motive to testify;

(5) used unreasonable, inexplicable, and legally inadequate reasons to deny him the right to testify on his own behalf;

(6) failed to prepare defense witnesses properly for cross-examination;

(7) failed to prepare to cross-examine the state's witnesses or to lay a foundation for the introduction of readily available exculpatory evidence;

(8) incompetently cross-examined the state's witnesses, eliciting testimony that the defendant was deceitful, domineering, manipulative, and controlling;

(9) opened the door to inadmissible testimony then failed to object to that testimony;

(10) failed to request a recess when confronted with a surprise document that the state should have produced in discovery and subsequently failed to confront defense witnesses with the document; and

(11) gave an incoherent, incomprehensible, and legally inadequate argument.

The defendant mentions, as a typical example of counsel's ineffectiveness, that his attorney's cross-examination of Detective Alvarez regarding the victim's delay in reporting the incidents allowed the detective to testify to an inadmissible opinion, which was against the defendant's interest. Citing State v. Nicholson, No 03C01-9901-CR-00035, Hamilton County (Tenn. Crim. App. Feb. 2, 2000), app. denied (Tenn. Sept. 11, 2000) (designated not for citation), he contends that this testimony was inadmissible because it required expert knowledge and even an expert cannot testify to the symptoms

of post-traumatic stress syndrome experienced by child abuse victims. The state does not address these contentions.

Other than the single example, the defendant does not suggest how his trial attorney was deficient nor how he was prejudiced regarding these enumerated allegations. We are left to rummage through the record and speculate about which instances form the bases of these allegations. Nevertheless, our review of the record reveals nothing to suggest the existence of a reasonable probability that the trial attorney's action or inaction rendered the results unreliable or the trial fundamentally unfair.

Regarding the cross-examination of Detective Alvarez, the trial attorney asked the detective if it were a fair statement that he never really understood why he was not contacted until four months after the first incident. Detective Alvarez responded that he was not surprised by the delay because in his experience with sexual abuse cases, it was common for disclosure to come several months following the incident. The attorney asked whether although delay was common, it raised a red flag. The detective admitted that he always asked why there was a delay in disclosure and admitted that he knew that the defendant's wife was seeking to separate from the defendant at the time of the disclosure. The attorney objected when the state asked Detective Alvarez on redirect examination if based upon his investigation of the case and his training and experience, he knew why it took so long for disclosure to take place in this case. The trial court overruled the objection stating that the state's question was in response to a question asked by the defense and the state was entitled to allow the witness to explain his answer. In response to the state's question about the reason for the victim's delayed disclosure, the detective answered:

> I put that in a category of what I call "survivability." And what I mean by "survivability" is that in cases of [a] sexual nature, sexual abuse, as long as that individual, the victim, is around or close to the person that is perpetrating against them, they will not speak out. First of all if you have contact with the individual there is a process of intimidation. Sometimes they feel intimidated. Sometimes they are afraid for their own welfare. They are afraid of what their families are going to say, what their loved ones are going to say, what their friends are going to say. There's even a guilt cycle that goes through in which many times the victims themselves will start thinking what did I do to create this. Maybe it is something that I did to get this person the idea that they could do this with me. There's just a whole bunch of things. A lot of times, when you are dealing with children, they are thinking what [are] my mom and dad going to think about me. And if it is somebody with whom they've had contact for a long [sic], once again, you know, we want to survive, and if survival means keeping my mouth shut then many times they choose that route. Disclosure comes about many times when the threat is removed, the threat is eliminated, and in this case Mr. Makransky was no longer available, Mr. Makransky had moved –

-16-

At this point, the trial attorney objected that the witness was not qualified to testify about what the victim thought during the delay and that the state had not qualified the witness as an expert. The trial court sustained the objection, ruling that although the state might be able to qualify the detective as an expert, it would be better to avoid testimony on what the victim thought and felt. Detective Alvarez testified that as a police officer, a licensed minister, and a church counselor, he had experience with approximately one thousand sex abuse cases and that the majority of those cases involved delayed disclosure.

The defendant argues that Detective Alvarez's opinion on delayed disclosure in sex abuse cases is inadmissible and that his trial attorney was ineffective for eliciting that opinion. At the hearing on the motion for a new trial, the defendant did not ask the trial attorney why he questioned Detective Alvarez about the delay in disclosure. The attorney did testify that as a part of his trial strategy, he attempted to emphasize the length of time between the April 1998 incident and the victim making a statement alleging that the defendant had molested her. He said that he planned to show that the victim did not make her allegations against the defendant until she had conversations with the defendant's wife and that the defendant and his wife were separated. Also, regarding his trial strategy, the attorney stated that he tried to show that the state's witnesses were plotting against the defendant. The attorney's question regarding delayed disclosure and follow-up question regarding the defendant and his wife separating conform with this strategy. This court has held that "child sex abuse may not be proven by evidence that the victim exhibited residual characteristics or behavioral traits similar to other victims of such abuse." State v. Anderson, 880 S.W.2d 720, 730 (Tenn. Crim. App. 1994) (holding that the admission of a social worker's testimony regarding "delayed disclosure" and "recantation" in child sex abuse cases constitutes error). Although Detective Alvarez's testimony regarding other sex abuse victims was inadmissible, the attorney attempted to curtail this testimony by objecting to the detective offering an opinion about the reasons behind delayed disclosure in sexual abuse cases. The defendant has failed to show that his attorney performed deficiently.

We note that the judgments for the two misdemeanor convictions reflect that the sentences are consecutive to the two felonies, while the transcript reflects that they are concurrent with one of the felonies. Ordinarily, when a conflict exists between the court minutes and the transcript of the proceedings, the transcript controls. See State v. Zyla, 628 S.W.2d 39, 42 (Tenn. Crim. App. 1981). Therefore, the judgments for those offenses are to be modified.

Based upon the foregoing and the record as a whole, we affirm the judgments of conviction, except the judgments for contributing to the delinquency of a minor are modified to reflect that the sentences for those offenses shall be served concurrently with the sentence for aggravated sexual battery.

_____
JOSEPH M. TIPTON, JUDGE